IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN MONAHAN, EMER MCKENNA, PABLO VARONA BORGES, ANTONIO SERNA, AND ROBERT LAMORTE,<br><br>PLAINTIFFS,<br><br>vs.<br><br>THE CITY OF NEW YORK, a municipal entity,<br><br>DEFENDANT. | Index No.<br><br><br>ECF CASE |

Plaintiffs Kevin Monahan, Emer McKenna, Pablo Varona Borges, Antonio Serna, and Robert Lamorte ("Plaintiffs"), through their attorneys, respectfully file this complaint against the Defendant named herein.  The allegations in the complaint are based on the knowledge of the Plaintiffs as to themselves, and upon information and belief, including the investigation of counsel and the publicly available facts of the action entitled *Packard, et al., v. City of New York*, 1:15-cv-7130-AT-SDA (S.D.N.Y.), as to all other matters.

## **PRELIMINARY STATEMENT**

1.      This is a civil rights action in which Plaintiffs seek relief for Defendant's violations of Plaintiffs' rights and privileges secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

2.      During the First Anniversary of Occupy Wall Street, September 15-17, 2012, the City of New York's policy failure to train executive level police officers on the First and Fourth Amendment rights of peaceful sidewalk protesters resulted in the NYPD's wide-scale misuse of the disorderly conduct (Penal Law § 240.20) and obstructing governmental administration (Penal

Law § 195.05) statutes to unconstitutionally arrest approximately 220 such protesters, including Plaintiffs.

3.     This extensive deprivation of constitutional rights is directly attributable to the City's disregard of notice and criticism, both internal and external, of its unconstitutional policing of similar Occupy Wall Street sidewalk protests during the prior year, as well as of other protests such as those advocating against the Iraq War in 2003 and the Republican National Convention in 2004.  Despite elected officials, advocacy groups, and concerned citizens providing clear notice to the City that its policing of sidewalk protests systematically violated protesters' constitutional rights, the City failed to train the NYPD, in particular its Executive Officers, in proper methods of policing such First Amendment protected activity.

4.     The City failed to train on: proper application of the disorderly conduct statute in the context of First Amendment sidewalk protests; the use of and requirements for lawful dispersal orders; proper egress for protesters who had been ordered to disperse; or the provision of alternative venues for protesters to exercise their First Amendment rights on the ultimate public forum -- New York City sidewalks.

5.     In an unconstitutional application of the disorderly conduct statute, Defendant consistently arrested protesters for blocking sidewalks, despite no substantial blockage of pedestrians.  In an unconstitutional application of the obstructing governmental administration statute, Defendant consistently arrested protesters despite no interference with law enforcement. When Defendant issued dispersal orders to protesters, it did not provide a route of egress or an alternate venue to protest or sufficient time to allow protesters to disperse.  These were effectively orders to stop protesting, which were often immediately enforced by the NYPD through the making of unconstitutional arrests.

6.     Plaintiffs were among those unconstitutionally arrested while exercising their First Amendment right to protest.

## JURISDICTION

7.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution.

8.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

9.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## VENUE

10.     Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## PARTIES

### Plaintiffs

11.     Plaintiff Robert Lamorte is a resident of the State of South Carolina, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct.  Mr. Lamorte was detained for approximately 8 hours in connection with this arrest.  As a member of the Class proposed in *Packard, et al., v. City of New York*, 15-7130-AT-SDA (S.D.N.Y.), the statute of limitations on

Plaintiff's claims were tolled until at least March 25, 2020, when Judge Torres declined to certify the proposed Class.

12.     Plaintiff Kevin Monahan is a resident of the State of New York, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct.  Mr. Monahan was detained for approximately 5 hours in connection with this arrest.  As a member of the Class proposed in *Packard, et al., v. City of New York*, 15-7130-AT-SDA (S.D.N.Y.), the statute of limitations on Plaintiff's claims were tolled until at least March 25, 2020, when Judge Torres declined to certify the proposed Class.

13.     Plaintiff Emer McKenna is a resident of the State of Washington, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when she was arrested and charged with disorderly conduct.  Ms. McKenna was detained for approximately 4 hours in connection with this arrest.  As a member of the Class proposed in *Packard, et al., v. City of New York*, 15-7130-AT-SDA (S.D.N.Y.), the statute of limitations on Plaintiff's claims were tolled until at least March 25, 2020, when Judge Torres declined to certify the proposed Class.

14.     Plaintiff Antonio Serna is a resident of the State of New York, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct. Mr. Serna was detained for approximately 7 and three quarter hours in connection with this arrest. As a member of the Class proposed in *Packard, et al., v. City of New York*, 1:15-cv-7130-AT-SDA (S.D.N.Y.), the statute of limitations on

Plaintiff's claims were tolled until at least March 25, 2020, when Judge Torres declined to certify the proposed Class.

15.     Plaintiff Pablo Verona Borgas is a resident of the State of New York, who was lawfully present on a sidewalk in downtown New York City on September 17, 2012 and participating in expressive speech activity related to the First Anniversary of Occupy Wall Street when he was arrested and charged with disorderly conduct. Mr. Verona Borgas was detained for approximately 9 and one-half hours in connection with this arrest.  As a member of the Class proposed in *Packard, et al., v. City of New York*, 1:15-cv-7130-AT-SDA (S.D.N.Y.), the statute of limitations on Plaintiff's claims were tolled until at least March 25, 2020, when Judge Torres declined to certify the proposed Class.

## **Defendant**

16.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York.

17.     Defendant City of New York maintains the New York City Police Department ("NYPD"), which is authorized to perform all functions of a police department per the applicable sections of the New York State Criminal Procedure Law.

## **STATEMENT OF FACTS**

### **The City's History of Arresting Sidewalk Protesters Absent Criminal Conduct**

18.     The City of New York has been a hotbed of protest activity with large scale protests arising from such events as the World Economic Forum in 2002, Anti-War protest in 2003, and the Republican National Convention in 2004, as well as the plethora of inhabitants and visitors who intend to be heard on New York City streets on any variety of issues on any given day.

19.     As the NYPD policed these protests, deficiencies in its methods have become clear. Prior to this time period, the NYPD utilized a negotiation and cooperation model of protest

policing, but starting with the approach to the 1998 policing of the Million Youth March in Harlem, the NYPD changed its protest policing to a command and control model based on five general elements: aversion to disruption, controlled access, divide and conquer, shock and awe, and zero tolerance.

20.     The shift in policing of protest in the early 2000's led to a number of large, multi-plaintiff lawsuits, with specific allegations pertaining to the unlawful arrests of sidewalk protesters engaged in political speech activity.

21.     These litigations include *Allen v. City of New York*, 1:03-cv-02829-KMW-GWG (S.D.N.Y.); *Haus v. City of New York*, 1:03-cv-04915-RWS-MHD (S.D.N.Y.); *Kunstler v. City of New York*, 1:04-cv-01145-RWS (S.D.N.Y.); and *Dinler v. City of New York*, 1:04-cv-07921-RJS-JCF (S.D.N.Y.), each of which alleged unconstitutional policing and arrests by the NYPD of various First Amendment sidewalk protests from 2002 through 2004. In each, sidewalk protesters were unlawfully arrested and charged with disorderly conduct.

22.     The *Allen* litigation included allegations that individuals protesting the World Economic Forum on February 3, 2002, remained on the sidewalk, marched two abreast, and followed all rules of appropriate sidewalk protesting in order to allow other pedestrians to walk on the sidewalk, and yet Executive Officers, including Chief Monahan of the NYPD, unlawfully arrested virtually every one of them.

23.     The *Kunstler* litigation included allegations that during April 2003 the NYPD unlawfully arrested a group of sidewalk protesters that were not blocking the entire sidewalk, but were lawfully exercising their rights protected by the First Amendment. The unlawful arrests were video-recorded. Defendant City of New York settled the litigation with payment in excess of $2,000,000.

24.     The *Dinler* litigation similarly included allegations that on August 31, 2004, the NYPD unlawfully conducted multiple arrests of sidewalk protesters. The unlawful arrests and improper sidewalk policing were video-recorded.

25.     These litigations are just examples of incidents involving the NYPD wrongfully arresting sidewalk protesters and by no means are an exhaustive list.[1]

### Occupy Wall Street and The City of New York's Response

26.     Plaintiffs were participants in the Occupy Wall Street movement.

27.     Occupy Wall Street ("OWS"), among other things, protests the institutionalized inequality that funnels political power, wealth, and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans and people their fair share.  In particular, OWS sought, and seeks, to bring attention to the unfair way in which ordinary people are allowed to suffer terrible hardship due to mortgage debt, student loan debt, or lack of affordable healthcare, as politicians and businessmen blame these people for "irresponsibility," while huge banks were rescued from any consequences of their own decision-making and actions by government bailouts funded by those same ordinary people's taxes.

28.     On September 17, 2011, the first OWS march occurred in the Financial District of Manhattan and the protesters were blocked from entering the Wall Street area by the NYPD, who had set up narrow choke points of ingress and egress.  The protesters found their way to Zuccotti

---

[1] For example, for litigations arising out of the 2004 Republican National Convention, the City paid approximately $18 million in damages and fees to plaintiffs and spent $16 million defending the lawsuits to outside counsel and the NYC Law Department.  This included the *Dinler* litigation. Jonathan Allen, *New York City to pay $18 million to settle lawsuits over 2004 arrests*, Reuters (Jan. 15, 2014, 6:25 PM), http://www.reuters.com/article/2014/01/15/us-usa-newyork-rnc-settlement-idUSBREA0E1S120140115.

Park and remained there for almost two months effectuating their political speech goals of drawing attention and raising awareness to the many issues of inequity.

29.     Over the course of the following year, the NYPD confronted and arrested protesters throughout the City of New York, frequently with violent results.  The protests were frequently covered in the media as were the numerous arrests of protesters.  News reports documented the police systematically clearing large groups of people from sidewalks while they engaged in First Amendment activity.[2]  Many litigations stemmed from these similar altercations between the police and OWS, many for improper arrests and the improper actions of the police towards sidewalk protesters, including, among other things, pepper spraying individuals engaged in expressive speech activities.[3]

---

[2] *See, e.g.,* Melissa Grace, Larry Mcshane, *Occupy Wall Street Protester hit with pepper spray demand [sic] arrest of NYPD Deputy Inspector Bologna*, N.Y. Daily News (Oct. 11, 2011, 6:54 PM),     https://www.nydailynews.com/new-york/occupy-wall-street-protestor-hit-pepper-spray-demand-arrest-nypd-deputy-inspector-bologna-article-1.961838; Cara Buckley, *New York Plans Surveillance    Veil    for    Downtown*,    N.Y.    Times    (July    9,    2007), https://www.nytimes.com/2007/07/09/nyregion/09ring.html; Al Baker, *Police Force Wall Street Protesters    Off    Sidewalks*,    N.Y.    Times    (Nov.    5,    2011,    9:16    PM), http://cityroom.blogs.nytimes.com/2011/11/05/police-force-wall-street-protesters-off-sidewalks/; Jim Axelrod, *NYPD employs corralling to control crowds*, CBS News (Oct. 9, 2011, 4:24 PM), https://www.cbsnews.com./news/nypd-emplys-corralling-to-control-crowds/
[3] Joseph Ax, *N.Y. City to pay $330,000 to settle pepper-spray Occupy lawsuits,* Reuters, (July 6, 2015,    6:02    PM),    http://www.reuters.com/article/2015/07/06/us-usa-occupy-lawsuit-idUSKCN0PG2GK20150706; *see also Laugier v. The City of New York, et al.,*1:13-cv-06171-JMF (S.D.N.Y.) )(settling lawsuit stemming from OWS protest at Brooklyn Bridge); *Appel v. The City of New York, et al.*, 1:14-cv-07992-KPF (S.D.N.Y.) (lawsuit from OWS protest at Foley Square); *Global Revolution TV v. City of New York, et al.*, 1:12-cv-05086-GBD (S.D.N.Y.) (lawsuit related to property damage from police activity); *Occupy Wall Street, et al. v. City of New York*, 1:12-cv-04129-GBD (S.D.N.Y.) (same).

30.     The NYPD was documented using corralling techniques and indiscriminately charging protesters with disorderly conduct for blocking pedestrian traffic even though "workers heading to their desks passed the protesters on the sidewalks with little incident."[4]

31.     The NYPD's over-zealous and unlawful application of the disorderly conduct and obstructing governmental administration statutes was not restricted to the many protests in lower Manhattan, but also to smaller protests in the outer-boroughs.

32.     For example, on October 3, 2011, in the Bronx, protesters were arrested for disorderly conduct on the false pretext that they were obstructing pedestrian traffic (hereinafter, the "Bronx Incident"). The Bronx Incident was filmed, and in fact, the sidewalk was wide open, with only a handful of protesters, a news reporter, and the police present. [5]

33.     Regardless, an NYPD Captain gave orders to the protesters to stop "blocking the sidewalk," and informed a Sergeant on the scene to "have the protesters continuously walk around" and ordered his subordinates to arrest anyone who stopped walking.

34.     In response to this outrageous and unlawful application of the disorderly conduct statute to protesters on an empty sidewalk, State and City legislators sent complaints to the City and the NYPD raising concerns about the police conduct.

35.     On December 13, 2011, New York State Senator Liz Krueger sent a letter to NYPD Commissioner Ray Kelly, Mayor Michael Bloomberg, and then-Public Advocate Bill de Blasio objecting to the police procedures used at Occupy Wall Street sidewalk protests.  Senator Krueger

---

[4] *See* Colin Moynihan, *Wall Street Protests Continue, With at Least 6 Arrested*, N.Y. Times (Sept. 19, 2011, 12:28 PM), https://cityroom.blogs.nytimes.com/2011/09/19/wall-street-protests-continue-with-at-least-5-arrested/.

[5] *See* Street Visuals, *NYPD Wrongfully Arrested Participants of Occupy The Bronx Festivities*, YouTube   https://www.youtube.com/watch?time_continue=44&v=JdGcQvCXKdM   ("Bronx Incident Video"), (Dec. 4, 2011).

specifically warned "that these practices appear to interfere with peaceful and legal protest behavior . . . ."  Senator Krueger described the arrests at an Occupy Wall Street demonstration in the Bronx, and provided a link to YouTube video footage of the incident, stating, "This video shows a demonstration that does not appear to be blocking the sidewalk, since the protesters are all lined up against a fence out of the main pedestrian pathway, but police officers insist that the protesters must move.  They then begin arresting protesters, apparently any time an individual stops walking, and an officer is heard telling the police to arrest anyone who is not moving.  While I understand the need to make sure sidewalks are not blocked, the police behavior does not seem related to that goal."  Senator Krueger provided clear notice to Defendant that the NYPD used unconstitutional policing to silence First Amendment sidewalk protests.

36.    On January 19, 2012, New York City Council Member Jessica Lappin similarly sent a letter to Commissioner Kelly conveying "serious concerns regarding police behavior at sidewalk protests conducted by the Occupy Wall Street Movement.  I urge you to investigate and clarify the procedures and tactics used by the NYPD at these events." Council Member Lappin also described the Bronx demonstration: "In this video, protesters appear to leave plenty of room on the sidewalk for pedestrian traffic.  However, police officers insist that the protesters move and arrest anyone who does not walk away."  Lappin concludes, "I am concerned that this type of police behavior is interfering with protesters' First Amendment rights."  Council Member Lappin provided clear notice to Defendant that the NYPD used unconstitutional policing to silence First Amendment sidewalk protests.

37.    The resulting internal NYPD investigation failed to evaluate the legality of the arrests or the police behavior that interfered with the First Amendment rights of the protesters.

The investigation was so lackluster that the Captain on-scene for the Bronx Incident was not even interviewed, nor were any recommendations made to address the clearly unlawful police behavior.

38.     Indeed, this incident was highly indicative of the policing of protests during the Fall of 2011 and Spring of 2012, as the NYPD continued to arrest numerous Occupy Wall Street protesters under the auspices of the disorderly conduct and obstructing governmental administration statutes.

39.     On November 5, 2011, The New York Times wrote about the improper arrest of Occupy Wall Street protesters that occurred upon a march reaching Foley Square:

> Hundreds of Occupy Wall Street demonstrators streamed into a desolate part of Foley Square on Saturday afternoon, but their slow-moving march turned chaotic as a phalanx of police officers issued orders to vacate the sidewalks — and then swept in to force the issue…. As the confrontation continued, the police kept yelling orders that the sidewalk was closed, or temporarily closed, or had to be closed to keep order. They fanned out in a line, stretching orange mesh netting across the breadth of the sidewalk, and walked along, pushing protesters back and sweeping them away.
> The strategy drew expressions of puzzlement from many in the area.
> "The police warned these people to move because of pedestrian traffic, but this is an empty place," said Robert Rosen, 66. "Who are they talking about?"[6]

40.     Incidents such as this one described by The New York Times would result in numerous arrests for the catch-all of disorderly conduct or obstructing governmental administration.  For example:

- November 5, 2011 (20 protesters arrested, 13 were charged with disorderly conduct);
- November 17, 2011 (243 protesters arrested, 228 were charged with disorderly conduct, 59 were also charged with obstructing governmental administration)
- January 1, 2012 (70 protesters arrested, 69 were charged with disorderly conduct); and,

---

[6]Baker, *supra.*

- March 18, 2012 (73 protesters arrested, all of whom were charged with disorderly conduct, 54 were also charged with obstructing governmental administration).

41.    As the NYPD aggressively policed these protests, the fact that it was unconstitutionally arresting protesters by improperly applying the disorderly conduct and obstructing governmental administration statutes on a wide-scale became inescapable.

42.    For example, on October 20, 2011, the New York Civil Liberties Union ("NYCLU") communicated to the City the need for the NYPD to issue clearer and more consistent dispersal orders during the protests.  Per the NYCLU, "[W]e also have been present at several locations (including two this past weekend) ***where police officers aggressively dispersed people standing lawfully on city sidewalks***.  While we recognize that such dispersal orders can be appropriate in limited circumstances, we urge the Department to be more careful with such orders."[7]  (emphasis added).  This NYCLU statement provided clear notice to Defendant that the NYPD frequently used unconstitutional policing to silence First Amendment sidewalk protests, yet was ignored.

43.    Indeed, the NYCLU issued several Free Speech Threat Assessments, detailing the ongoing "risks to the right to protest as a result of heavy-handed NYPD policing and harassment of individuals engaged in First Amendment Activity." For example:

- A March 17, 2012 – April 10, 2012 Free Speech Threat Assessment detailed the NYPD's restriction of protester activity and movement by using barricades and closing sidewalks.
- An April 11, 2012 – April 28, 2012 Free Speech Threat Assessment detailed the NYPD's continued use of barriers against protesters, and that the barriers themselves impeded pedestrian traffic, as well as an incident where the "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration."

---

[7] https://www.nyclu.org/sites/default/files/releases/NYCLU_Ltr_to_Kelly_re_OWS_10-20-11.pdf

- An April 29, 2012 – May 29, 2012 Free Speech Threat Assessment alerted that "NYPD officers would order a sidewalk to be cleared, stating the people were obstructing pedestrian traffic or that the sidewalk was closed, and shoved those assembled at random.  Sometimes protesters were forced to march in one direction only to have other officers order them to turn the march around minutes later."

44.     Following this continued aggressive policing by the NYPD, international human rights and U.S. civil liberties experts issued the comprehensive and damning report: *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*.[8]  *Suppressing Protest* detailed numerous arrests related to Occupy Wall Street, as well as the NYPD's improper and arbitrary closure of sidewalks to arrest protesters. *See id*. at 115 ("Many arrests of Occupy protesters have taken place in the context of police seeking to enforce sidewalk closure or protest dispersal; protesters are typically charged with 'disorderly conduct.'").  *Suppressing Protest* tellingly concluded, "The pervasive NYPD practice of frequently 'closing' sidewalks and forcibly moving along peacefully assembled individuals violates the freedoms of expression and assembly."  *Id*. at 118 (emphasis added).

45.     The NYPD refused to meet with the authors of the report, despite their requests to speak while they were compiling their research.

46.     On July 25, 2012, fifty-four (54) days prior to the one-year anniversary of Occupy Wall Street, the authors of Suppressing Protest provided the report to the City of New York and the NYPD.

---

[8] The Global Justice Clinic (NYU School of Law), Walter Leitner Int'l Human Rights Clinic (Fordham Law School), *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (July 21, 2012), *available at* hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf. Hereinafter, referred to as "*Suppressing Protest*".

47.     Others also complained to the NYPD of its frequent unconstitutional policing of First Amendment activity on sidewalks.  Shortly after the Occupy Wall Street protests began, the NYPD Police Commissioner's Office received complaints from the Partisan Defense Committee demanding a cessation of brutal police attacks against protesters as "[t]his is a blatant attack on the rights of speech and association."    A "professional who works at 25 Broadway" similarly complained, "Since the Occupy Wall St. protest began. . . I have personally witnessed unnecessary police force, brutality, and reckless endangerment of peaceful citizens exercising their constitutional right to peacefully assemble."

48.     These complaints fell on deaf ears at the NYPD and the City of New York, demonstrating Defendant's deliberate policy of ignoring First Amendment rights.

49.     As a result, the large majority of Occupy Wall Street related arrests during the first year in New York City were for offenses such as disorderly conduct—a non-criminal violation akin to jaywalking.  Indeed, Mayor Michael Bloomberg recognized that, "the majority of the protesters have been peaceful and responsible."[9] Yet, the majority of the protesters who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a summons.  Furthermore, between September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested. Only 409 of these arrests resulted in a plea or conviction for any charge.  That is a conversion rate of just over 15% for the thousands of Occupy Wall Street related arrests during the one-year period.  The remainder of the arrests were dismissed.

---

[9] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

50.     For comparison purposes, according to statistics collected by NYS Division of Criminal Justice Services and publicly available[10] indicate a conversion rate for convictions for those arrested with a top charge of a misdemeanor of 55.9% in 2014, 52.6% in 2015, 52.7% in 2016, 49.3% in 2017 and 35.5% in 2018.

51.     According to FOILed documents from the Manhattan District Attorney's Office ("DANY"), the DANY statistics show a Decline to Prosecute rate of 10.7% for all OWS arrests except the October 1, 2011 Brooklyn Bridge arrests (a distinction made by DANY). According to the publicly available statistics collected by NYS Division of Criminal Justice Services, the decline to prosecute rate for misdemeanor arrests was 2.4% in 2014, 2.1% in 2015, 2.5% in 2016, 3.4% in 2017 and 6.2% in 2018.

52.     As the low conversion rate and high decline to prosecute percentages indicate, there was an ongoing problem with the policing of Occupy Wall Street and the arrests of OWS protesters.

53.     Indeed, further proof of the improper policing of members of Occupy Wall Street can be seen by the voluminous litigation that has arisen related to the improper policing of the constitutionally protected expressive speech activity.

54.     From research of ECF in the Southern District of New York, plaintiffs have identified at least ninety-three distinct lawsuits filed in the S.D.N.Y. by individuals who claimed to have had their constitutional rights violated at or during an Occupy Wall Street event.

55.     Sixty-six of these lawsuits were either settled or otherwise resolved favorably to the Plaintiffs, and twenty-one were resolved favorably to the defense.  Four of these litigations

[10] https://www.criminaljustice.ny.gov/crimnet/ojsa/dispos/index.htm

remain open.  One matter went to trial with the Plaintiff obtaining a verdict against Edward Winski with only a nominal award granted.

56.      Forty-three of the matters that were resolved favorably to Plaintiffs had  allegations similar to the allegations in this complaint including unconstitutional sidewalk arrests, or arrests that occurred with insufficient or no dispersal orders, or insufficient or no time or path for plaintiff protesters to disperse.

57.      At least eight of these ninety-two lawsuits were filed prior to August 1, 2012, and five of these lawsuits included allegations similar to those in this complaint.

58.       At least seven lawsuits were filed and settled for arrests that involved similar allegations and on the same date, September 17, 2012, as those alleged in this complaint.  Six of those settlements totaled $361,500.

## Deliberate Indifference and Failure to Properly Train

59.      By early 2012, and no later than the publication of *Suppressing Protest* on July 25, 2012, Defendant City of New York knew or should have known that members of its police force would encounter individuals engaged in expressive speech activity, especially after months of continued protests, news stories, and multiple lawsuits alleging unlawful arrests.  Even so, the City of New York failed to provide adequate training to NYPD police officers in the handling of protesters exercising First Amendment rights.

60.      Internally, Defendant deliberately ignored that Occupy Wall Street presented challenges it was not effectively addressing.  For example, Occupy Wall Street was selected as an NYPD case study, along with Stop and Frisk, the shooting of a man by police officers in Times Square, and the shooting of a pit bull.

61.     Relevantly, the case study included the findings of *Suppressing Protest* as reference material.  The study was set to begin in September 2012 and continue through the Fall, concurrent with the First Anniversary of Occupy Wall Street.

62.     The study should have led Defendant to recognize there were issues with its policing of Occupy Wall Street.  However, despite an internal memorandum labeled "Issues Related to Occupy Wall Street," wherein the NYPD admitted that "Patrol is not trained in mass arrest techniques nor utilization of flex cuffs," no training changes were instituted or begun.

63.     Despite receiving the aforementioned notice of significant constitutional violations in NYPD policing of sidewalks protest, Defendant did not provide any specialized trainings on the subject.

64.     NYPD training begins at the Police Academy before recruits graduate to become police officers.  Following graduation from the academy, NYPD members of service receive in-service training which includes mandatory topics such as firearms and taser proficiency and the use of defibrillators, as well as a number of elective courses depending on the rank and unit of the member.  Members of service are also required to take trainings to be promoted.  In addition, the NYPD may direct its members to participate in department-wide training on a variety of issues, such as counter-terrorism. Executive Officers (captains and higher in rank) are provided additional discretion in choosing their own trainings.

65.     The bulk of NYPD training occurs in the Academy, which for executive level officers can be over 30 years prior to making arrest decisions at sidewalk protests.

66.     Following the Academy, these Executive Officers, who are tasked with the decision-making authority on evaluating probable cause determinations and whether to make arrests at sidewalk protests, are not provided any pertinent training on how to police protests, or

any refresher training on constitutionally compliant sidewalk protest policing.  Instead, the NYPD relies only on the Academy training to cover these issues.

67.  As noted by Lt. Vega of the Disorder Control Unit ("DCU") of the NYPD, "Crowd control is a perishable skill.  If you don't practice it, you start to learn—I mean you forget what you learned when it comes to that."  The same is true for those aspects of policing sidewalk protests that relate to the First Amendment rights of protesters, which are entirely omitted from executive training as described below.

68.  The City did not provide any lectures or trainings for executive level officers concerning:

- Policing public assemblies, marches, or demonstrations;
- The constitutional right of individuals and groups to protest on sidewalks;
- Arresting protesters engaged in First Amendment speech activity;
- The interplay of First Amendment principles and policing public assemblies, demonstrations, or protests;
- Application of the disorderly conduct statute consistent with the First and Fourth Amendment rights of protesters;
- Enforcement of Penal Law 240.20 (5) & (6) (disorderly conduct);
- Enforcement of Penal Law 195.05 (obstruction of governmental administration);
- Well-established New York State law that the "mere inconveniencing" of pedestrians is not a violation of the disorderly conduct statute;
- The use and legal requirements for dispersal orders;
- The use and legal requirements of alternative forums for protest; and
- The use and legal requirements for imposition of time, place, and manner restrictions on protest activity.

69.  Furthermore, to prepare for the Republican National Convention of 2004, the City provided training concerning the extent of interference with pedestrian traffic that is needed to support a disorderly conduct arrest, but admitted that no such training was provided after 2004.

70.  Similarly, the City did not incorporate into its post-Academy training materials the legal ruling announced by the New York State Court of Appeals in *People v. Jones*, 9 N.Y.3d 259

(2007) ((i) setting out the *mens rea* required; and (ii) reinforcing that an arrest for disorderly conduct statute requires more than mere inconvenience of pedestrians).

71.     The City provided no refresher courses to the executive level officers (who are tasked with making the difficult probable cause determinations at protests) on these relevant training subjects.

72.     A specific unit within the NYPD, the Disorder Control Unit, was tasked with training the members of service how to respond to protests.  The Disorder Control Unit was responsible for, among other things, conducting comprehensive reviews of all department plans for responding to civil disorder and for developing and recommending specialized training for crowd management and civil disorder.  The unit also responded to civil disorders to assist commanders at the scene.

73.     Prior to Occupy Wall Street, the Disorder Control Unit conducted a large-scale mobilization field exercise in August 2011.  This exercise consisted of three stations:  (1) high profile vehicle rescues; (2) lines, wedges, and other disorder control formations; and (3) mass arrest techniques and deployment of protective masks.

74.     This training did not involve disorderly conduct standards, First Amendment protections, sidewalk protests, or crafting dispersal orders.   Indeed, two weeks before the start of Occupy Wall Street, an internal DCU memorandum summarized the 17 lesson plans it trained on and ***none*** involved sidewalk protest policing or constitutional standards governing the policing of sidewalk protest, but rather included "Civil Disorder"; "Rapid Mobilization"; "Containing the Event – Barrier Plans"; "Use  of Protective Shields"; "Gas Mask Deployment"; "Looting Scenario Training"; "Man Portable Air Defense Systems"; and "Incident Command Post Setup and Operations".

75.     The Disorder Control Unit conducted numerous trainings for NYPD members of service throughout Occupy Wall Street.  Between September 2011 and September 2012, the Disorder Control Unit trained over 12,000 members of service. These trainings focused on crowd control techniques and formations, and did not include any lesson plan dedicated to sidewalk protest or the degree of interference with pedestrian traffic needed to arrest protesters for disorderly conduct.

76.     While DCU conducted trainings on a massive scale prior to and during Occupy Wall Street, these trainings focused on police formations and various tactics to be used by the police to "clear the sidewalk" and "disperse and demoralize" but did not provide any training on how to utilize these tactics without infringing on the constitutional rights of sidewalk protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest when issuing a dispersal order to a sidewalk protester.

77.     In November and December 2011, the unit conducted Disorder Control Training for members of service policing Occupy Wall Street.  Anthony Raganella, the head of the unit at the time, testified that the unit does not train when it is appropriate to make arrests, but how to conduct them.

78.     Accordingly, the Disorder Control Unit did not provide training about dispersal warnings or arrest warnings, or the provision of alternative locations for protesters.  Nor did it provide training on probable cause standards for disorderly conduct.

79.     The Disorder Control Unit instead trained members of service on (1) lines, wedges, and other disorder control formations, (2) mass arrest techniques, and (3) protective shields and mesh barrier equipment review.

80.     It provided no training on conduct necessary for probable cause to make arrests, the First Amendment Rights of protesters, or dispersal orders.

81.     The Disorder Control Unit similarly conducted trainings for the May Day Protests in 2012 and the First Anniversary of Occupy Wall Street.  These trainings similarly excluded training on probable cause and constitutional policing of sidewalk protests.  The content of these trainings did not change from training in prior years.

82.     In fact, over the course of Occupy Wall Street, the Disorder Control Unit did not update its training with regard to sidewalk protests in any manner.

83.     Rather, in the protest guidelines provided to all members of service, the City flatly stated, contrary to the constitutional rights of protesters and the legal standards for disorderly conduct under New York State law, that "Sidewalks must remain clear to pedestrian traffic (especially around Zuccotti Park)."

84.     All of these failures to train on specific, relevant aspects of constitutional policing of sidewalk protest despite having received clear notice that NYPD policing of protests was causing the systemic violations of protesters' constitutional rights demonstrates a policy of disregard for First Amendment rights.

## THE TWO EXECUTIVE OFFICERS SUPERVISING OCCUPY WALL STREET HIGHLIGHT THE LACK OF TRAINING AND THEY DID NOT UNDERSTAND STANDARDS OF SIDEWALK PROTEST POLICING

85.     Inspector Edward Winski and Retired Chief Thomas Purtell were the Executive Officers in charge of overseeing the policing of Occupy Wall Street, including assigning on-scene supervisors to police First Amendment sidewalk protests during Occupy Wall Street (up to and including during the one year anniversary).

86.     Inspector Winski testified in a deposition in another OWS lawsuit that when he chose officers to police Occupy Wall Street he did not take into account whether the officer understood the Constitution and rights guaranteed by the First Amendment, but preferred officers that looked good in a uniform.

87.     Inspector Winski did not keep up to date on legal standards, and in fact testified that he did not recall reading any Legal Bureau Bulletins between June 2013 and April 2016.

88.     When questioned on the standards of the disorderly conduct statute applicable to sidewalk protest, Inspector Winski testified that there was no minimal amount of time the obstruction would have to occur for an arrest to be justified.

89.     Inspector Winski further testified in a deposition in another OWS lawsuit that he provided instruction or guidance to the majority of the police officers at Occupy Wall Street on how to enforce the disorderly conduct statute with regard to individuals involved in First Amendment expressive speech activity.

90.     Inspector Winski has been a defendant in at least nine different lawsuits arising from conduct at Occupy Wall Street protests.  A Federal jury in the S.D.N.Y. found that he had violated the constitutional rights of an OWS protester during an arrest in Zuccotti Park during the first week of OWS in September 2011.

91.     Among the officers chosen by Inspector Winski to police Occupy Wall Street was NYPD Lieutenant Konstantinidis, who was responsible for supervising officers at Zuccotti Park during Occupy Wall Street a few days per week, even though Lieutenant Konstantinidis testified in a deposition in another OWS lawsuit that he did not remember the training he received regarding the First Amendment rights of protesters, and testified that he didn't know what the First Amendment meant in police work.

92.    Retired Chief Purtell admitted that he has never had any training regarding dispersal of First Amendment demonstrators, or a requirement for dispersal orders of protesters to have alternative avenues of protest, and that he has had no training on dispersal orders since 1993 or 1994, and that the NYPD does not give dispersal orders to sidewalk protesters who are standing on the sidewalk.

93.    While tasked with overseeing the policing of Occupy Wall Street protests from September 17, 2011 until the First Anniversary of Occupy Wall Street and beyond, Retired Chief Purtell had the mistaken understanding that a dispersal order was not required to provide an alternative forum.

94.    Retired Chief Purtell believes that an order solely commanding protesters to "leave – to leave the area" was a constitutionally compliant dispersal order in the context of a First Amendment protest. During his career in the NYPD, Retired Chief Purtell never set up an alternative avenue of protest and "never set up a free speech zone" to facilitate First Amendment speech at an OWS protest.

95.    As previously noted, only a cursory training on Constitutional issues relevant to sidewalk protest policing during the brief (six months) time spent in the police academy was provided to NYPD members of service.

96.    OWS protests were policed not merely by patrol officers, but by high ranking Executive Officers of the NYPD.

97.    Executive Officers are defined by the NYPD as members above the rank of Lieutenant.  This would include Captain, Deputy Inspector, Inspector, and higher ranks.

98.    At sidewalk protests, arrest decisions are most often made solely by an executive officer and communicated to a lower ranking officer, usually a police officer, to effectuate or process the arrest of the sidewalk protester.

99.    These Executive Officers are often 20 or 30 years removed from their police academy training.

100.    These Executive Officers are not provided with update or refresher courses in constitutionally compliant sidewalk policing once they leave the police academy.

101.    These Executive Officers had the duty to identify problems in policing and communicate the need to update training based upon this information to their supervisors.

102.    The Disorder Control Unit members had the duty to review the policing that led to mass arrests and communicate the need to update training based upon this information to their supervisors.

103.    On March 8, 2012, one of the top NYPD ranking members, Chief Esposito, communicated to the head of the Disorder Control Unit to "TRAIN, TRAIN, TRAIN" thousands of members of the NYPD concerning mass arrest technique in anticipation of the May 1, 2012 "May Day" protests due to "OWS demos and protestors". This message was communicated 54 days prior to the May Day protests.

104.    Disorder Control Unit was able to bring in thousands of officers for this training in these 54 days.

105.    The NYPD had the ability of updating its training and providing this training to thousands of officers in short order when it decided it was necessary and appropriate. If the same message had been provided by a high ranking NYPD member concerning training to Executive Officers regarding disorderly conduct and dispersal orders at sidewalk protest on July 25, 2012,

the Disorder Control Unit would have had 54 days to provide an update and refresher training to the hundreds of Executive Officers that policed the September 17, 2012 OWS one-year anniversary protests.

### The First Anniversary of Occupy Wall Street

106.    On September 15 – 17, 2012, protesters from around the country came to New York to celebrate the First Anniversary of Occupy Wall Street.

107.    The geographic focus of the protest was downtown Manhattan, where the Occupy Wall Street movement had blossomed throughout the prior year.

108.    In anticipation of these protests, Defendant prepared by allocating personnel and resources to the area, creating shift schedules, and conducting various intelligence briefings.

109.    Had the City properly acknowledged the complaints of the elected officials, the NYCLU, and/or *Suppressing Protest*, as established by its May Day 2012 training, the NYPD would have had sufficient time prior to the First Anniversary of Occupy Wall Street to have its Executive Officers undergo a refresher training on constitutionally compliant protest policing standards.

110.    Yet, as the City prepared for the First Anniversary of Occupy Wall Street and the large number of protesters the NYPD anticipated converging in downtown Manhattan, the NYPD did not provide training on the First Amendment, or the application of the disorderly conduct and obstructing governmental administration statutes.

111.    As the protests unfurled, the NYPD continued its aggressive policing to keep the sidewalks "clear."

112.    To clear the sidewalks, Defendant used a series of tactics to unconstitutionally apply the disorderly conduct and obstructing governmental administration statutes:

(1)     The NYPD abruptly created police lines on sidewalks in front of marches and ordered protesters to disperse even when there were no pedestrians;

(2)     The NYPD used French barriers (mobile interlocking metal barriers) to prevent marches from proceeding, and ordered protesters to disperse without the provision of alternate venues for protest, all while police barricades rather than protesters impeded pedestrian traffic;

(3)     The NYPD entered the sidewalk and made random arrests for allegedly blocking pedestrian traffic and ignoring orders to disperse; and

(4)     The NYPD used dispersal orders that failed to provide alternative venues for protesters to continue exercising their First Amendment Rights as the purported legal basis for arrests.

113.    These tactics sought to chill protesters' rights and desire to protest by instilling fear in the peaceful protesters that regardless of their conduct, there was a chance they would be randomly arrested.

114.    These tactics further violated protesters' First Amendment rights because they were employed to clear the sidewalks of protest, rather than for any legal purpose. These tactics culminated in unlawful and unconstitutional arrests for violations of the disorderly conduct and obstructing governmental administration statutes.  Often these tactics resulted in substantially impeding pedestrian traffic—the very violation for which protesters were allegedly arrested. Moreover, these tactics included arbitrary orders that were not issued to allow pedestrian traffic, but instead to clear the sidewalk of protesters. Such orders failed to include alternate venues for protest and prevented protesters from continuing to exercise their constitutionally protected rights.

115.    Most often, the NYPD would block individual traffic lanes or entire roadways while policing sidewalk protest, preventing vehicular traffic on these lanes or roadways.  Logic would dictate that if the NYPD was going to block a single lane or an entire roadway to vehicular traffic, the protesters should be allowed to utilize the streets.  Yet, time and time again, the NYPD would

over-police sidewalk protest, create logjams and crowded sidewalks all the while the NYPD was

blocking individual traffic lanes and entire roadways to vehicular traffic.

116.    The September 15, 2012 on-the-ground events as detailed by The New York Times

reveal the breadth of these tactics:

> [On September 15th at 8:30 p.m.], near Thames Street, a commander
> ordered the crowd to disperse, and a moment later officers pushed
> into the crowd, knocking down some protesters and arresting some.
>
> The police repeated that maneuver a few minutes later, and then
> pushed a group of protesters against the side of a building. One man
> objected, and an officer pulled him from the crowd and arrested him.
> At least two other arrests followed, with officers appearing to grab
> some people almost at random.
>
> Across Broadway, a commander announced that protesters could
> not stand on a stretch of sidewalk. A man yelled that he had the right
> to be there and the commander chased him for several feet before
> the man scrambled away.
>
> By 9 p.m., almost all of the remaining protesters left the area as a
> line of officers advanced toward a group standing on the corner of
> Liberty Street and Broadway while a captain announced through a
> megaphone that the group was blocking pedestrian traffic.[11]

117.    From September 15 to September 17, 2012, the NYPD made 226 arrests related to

the First Anniversary of Occupy Wall Street, many based on the unconstitutional application of

the disorderly conduct statute and resulting from these unlawful tactics.  Defendant maintains

records of each arrest, which includes the charges and the disposition of those charges, as well as

the addresses of those arrested, and the length of their detentions.

118.    Of the 226 protesters arrested, 137 received adjournments in contemplation of

dismissal; 29 were declined prosecutions; and 17 had all charges dismissed outright, all without

---

[11] Colin Moynihan, *Several Arrests at Occupy Wall Street March*, N.Y. Times (Sept. 16, 2012),
http://www.nytimes.com/2012/09/16/nyregion/several-arrests-at-occupy-wall-street-march.html.

any fact finding procedures regarding the arrest justifications. Thus, excluding cases that were not disposed (outstanding warrants from the arrests), over 90% of the case dispositions were favorable (dismissals, declined prosecutions, acquittals) to the protesters.

119. The 90% dismissal rate demonstrates Defendant's policy and failure to train on constitutional policing of sidewalk protests, despite the clear notice of the NYPD's unconstitutional policing of protests, which predictably resulted in widespread unconstitutional arrests.

**Each Plaintiff's Experience**

**Plaintiff Kevin Monahan**

120. In the afternoon of September 17, 2012, Plaintiff Monahan was participating in expressive speech activity by lawfully marching on the sidewalk of Broadway in the financial district.

121. Plaintiff Monahan was carrying a small cardboard sign, and engaging in both verbal and expressive political speech.

122. As Plaintiff was marching north on the east sidewalk of lower Broadway in the middle of a group of protesters, members of the NYPD entered the sidewalk from the roadway and physically split the protesters by creating a line of NYPD officers in the middle of the group of protesters, separating the protesters into a north and south group.

123. At the edge of the sidewalk, police barricades were set up on the curb line extending south to Wall Street.

124. Just before the NYPD split the group, Plaintiff Monahan had been in the middle. After the NYPD split the group, Plaintiff Monahan was now in the very front of the south group of protesters.

125.    The south group of protesters were restricted from proceeding north by the NYPD officers that had entered the sidewalk and split the group.  The south group of protesters were also restricted from proceeding south due to an additional, simultaneous deployment of a different group of NYPD officers.

126.    The officers at the front of the south group of protesters issued no orders to the group of protesters.  Approximately 15 seconds from the moment that the NYPD entered the sidewalk and separated this group of protesters into two groups, Plaintiff Monahan was arrested at the front of the south group.

127.    As members of the NYPD placed handcuffs on Plaintiff Monahan, Mr. Monahan stated loudly, "My name is Kevin Monahan.  I didn't do anything. They picked me out of the crowd at random."

128.    Within the next 60 seconds, the NYPD arrested four other individuals who were participating in the middle of a sidewalk protest march, but found themselves at the front of the south group and quickly arrested without being given any orders.

129.    Approximately two minutes after separating the protesters into two groups, and at least 90 seconds after the arrest of Plaintiff Monahan, a member of the NYPD gave the following amplified order:  "Guys, let's go.  If you do not move, you are going to be arrested."

130.    In the moments following that order, the south group of protesters turned around and began marching south on Broadway towards Wall Street.

131.    Plaintiff Monahan's arrest report falsely indicated that he was observed "obstructing pedestrian traffic on public sidewalk after a lawful order by Captain [Duffy] to disperse by blowhorn."

132.    The District Attorney of New York declined to prosecute this case stating that the arresting officer observed "defendant as part of a large group of pedestrians walking on the sidewalk, blocking pedestrian traffic.  Another officer shouted on a blowhorn for them to disperse. The defendant was then observed walking in the opposite direction of the large group. The defendant was placed under arrest for blocking pedestrian traffic.  Based on these set of facts, the People decline to prosecute at this time."

133.    The failure of the City of New York to update its training on sidewalk protest policing, and to train the Executive Officers in charge of policing the First Anniversary of Occupy Wall Street, led to the violation of Plaintiff Monahan's Fourth Amendment rights and false arrest.

**Plaintiff Emer McKenna**

134.    In the afternoon of September 17, 2012, Plaintiff McKenna was participating in expressive speech activity by lawfully marching on the sidewalk of Broadway in the financial district.

135.    Plaintiff McKenna was engaging in verbal political speech amongst other individuals holding signs.

136.    As Plaintiff McKenna was marching north on the east sidewalk of lower Broadway in the middle of a group of protesters, members of the NYPD entered the sidewalk from the roadway and physically split the protesters by creating a line of NYPD officers in the middle of the group of protesters, separating the protesters into a north and south group.

137.    At the edge of the sidewalk, police barricades were set up on the curb line extending south to Wall Street.

138.    Just before the NYPD split the group, Plaintiff McKenna had been in the middle. After the NYPD split the group, Plaintiff McKenna was now in the very front of the south group of protesters.

139.    The south group of protesters were restricted from proceeding north by the NYPD officers that had entered the sidewalk and split the group.  The south group of protesters were also restricted from proceeding south due to an additional, simultaneous deployment of a different group of NYPD officers.

140.    The officers at the front of the south group of protesters issued no orders to the group of protesters.  Approximately 15 seconds from the moment that the NYPD entered the sidewalk and separated this group of protesters into two groups, Plaintiff McKenna was arrested at the front of the south group.

141.    As members of the NYPD placed handcuffs on Plaintiff McKenna, Ms. McKenna stated quietly, "I am not resisting. I didn't do anything. I did absolutely nothing wrong, I am not resisting," Plaintiff McKenna then called out to an associate to inform others of her arrest.

142.     In a short time, the NYPD arrested four other individuals who were also participating in the middle of a sidewalk protest march, but found themselves at the front of the south group and quickly arrested without being given any orders.

143.    Approximately two minutes after separating the protesters into two groups, and at least 90 seconds after the arrest of Plaintiff McKenna, a member of the NYPD gave the following amplified order:   "Guys, let's go.  If you do not move, you are going to be arrested."

144.    In the moments following that order, the south group of protesters turned around in attempts to march south on Broadway towards Wall Street, but were prevented from doing so by

an additional NYPD task force line. Within another 60 seconds NYPD then began allowing people on the sidewalk to again proceed northbound, stating "If you want to go, get out of here now."

145.   Plaintiff McKenna's arrest report indicated that she was observed "on public sidewalk blocking  pedestrian traffic."

146.   Plaintiff McKenna's charges were dismissed with an adjournment in contemplation of dismissal.

147.   The failure of the City of New York to update its training on sidewalk protest policing, and to train the Executive Officers in charge of policing the First Anniversary of Occupy Wall Street, led to the violation of Plaintiff McKenna's Fourth Amendment rights and false arrest.

**Plaintiff Pablo Varona Borges**

148.   On the morning of September 17, 2012, Plaintiff Borges was marching with a group of individuals on the sidewalks in downtown Manhattan, engaging in expressive speech activity including carrying banners, signs and flags. Plaintiff Borges was carrying a flag, as were other marchers nearby.

149.    While Plaintiff Borges was marching north on Broadway in the middle of a group of protesters, members of the NYPD entered the sidewalk, grabbed Plaintiff Borges, and confiscated the flag he was carrying and unlawfully arrested him.

150.   Plaintiff Borges was placed under arrest, detained, removed from the protest and charged with disorderly conduct.  All of the charges were eventually dismissed.

151.   The failure of the City of New York to update its training on sidewalk protest policing, and to train the Executive Officers in charge of policing the First Anniversary of Occupy Wall Street, led to the violation of Plaintiff Borge's Fourth Amendment rights and false arrest.

**Plaintiff Antonio Serna**

152.    On the morning of September 17, 2012, Plaintiff Serna was engaged in expressive speech activity on lower Broadway, marching and protesting with a group of others engaged in similarly protected First Amendment conduct.

153.     At approximately 9:20 A.M., Plaintiff Serna observed an arrest taking place of a protester by a member of the NYPD.

154.    Plaintiff Serna remained in the vicinity of this stop and arrest and began taking photographs of the arrest of the protester.

155.    At no point did Plaintiff Serna seek to interfere with the arrest or affect the work of the police officers involved in the arrest.

156.    Even though Plaintiff Serna was breaking no laws and was legally allowed to remain in the vicinity of this arrest and to photograph the arrest, one of the police officers involved in the arrest that Plaintiff Serna was documenting took a step towards Plaintiff Serna and ordered him to cross the street to the sidewalk on the other side.

157.    As Plaintiff Serna sought to comply with this possibly unlawful order, another Police Officer arrested Plaintiff Serna.

158.    Plaintiff Serna was charged with violations of two counts of disorderly conduct, 240.20(5) and 240.20(6).

159.    In the criminal complaint filed against Plaintiff Serna, Police Officer Peter Agelis stated that he was "informed by Sergeant Keith Gorman of the Intelligence Division, Criminal Section, that he saw [Plaintiff Serna] in the middle of the street with numerous other people such that vehicular traffic was not able to pass.  [PO Agelis is] further informed that [Plaintiff Serna] refused to move on when instructed to do so by New York City Police Department supervisors."

160.    The failure of the City of New York to update its training on sidewalk protest policing, and to train the Executive Officers in charge of policing the First Anniversary of Occupy Wall Street, led to the violation of Plaintiff Serna's Fourth Amendment rights and false arrest.

161.    This case against Plaintiff Serna was eventually dismissed after he accepted an adjournment in contemplation of dismissal.

**Plaintiff Robert Lamorte**

162.    On the morning of September 17, 2012, Plaintiff Lamorte was engaged in expressive speech activity on lower Broadway, marching and protesting with a group of others engaged in similarly protected First Amendment conduct.

163.    At some point during the morning, Plaintiff Lamorte was on the sidewalk on the corner of William and Beaver Street.

164.    The entrance from the sidewalk into the crosswalk was being blocked by members of the NYPD.

165.    Plaintiff Lamorte was waiting for the pedestrian light to change so he could proceed forward, step off the sidewalk into the crosswalk and cross the street.

166.    While waiting for the pedestrian light to change, a member of the NYPD gave an order to Plaintiff Lamorte telling him to get on the sidewalk.

167.    Plaintiff Lamorte was already standing on the sidewalk and replied to the Police Officer that he was already standing on the sidewalk.

168.    In response, a white shirt Police Officer pulled Plaintiff Lamorte to the ground and detained him, placing him under arrest.

169.    Plaintiff Lamorte was charged with one count of disorderly conduct 240.20(5). In the criminal complaint Lieutenant Brian Nyhus falsely stated, "I observed the defendant standing

in the street with a crowd of several hundred other people as part of an Occupy Wall Street protest, preventing vehicles from driving down the street and causing pedestrians to be pushed into cars. Using a megaphone, I ordered the defendant and the other individuals to walk on the sidewalk to allow vehicular traffic to follow."

170.    In the notes contained in the District Attorney New York data sheet, it indicates that the NYPD is unsure if they ordered protesters to disperse when they made an announcement over the megaphone for people to get on the sidewalk.

171.    Video evidence produced in the *Packard* litigation prove these sworn police statements to be false.

172.    The failure of the City of New York to update its training on sidewalk protest policing, and to train the Executive Officers in charge of policing the First Anniversary of Occupy Wall Street, led to the violation of Plaintiff Lamorte's Fourth Amendment rights and false arrest.

173.    This case was eventually dismissed against Plaintiff Lamorte after he accepted an adjournment in contemplation of dismissal.

## **FIRST CLAIM FOR RELIEF**

## **DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

174.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

175.    At all relevant times herein, Defendant City of New York maintained a policy through its failure to train the executive members of the NYPD on the First and Fourth Amendment rights of peaceful sidewalk protesters and application of the disorderly conduct (P.L. 240.20) and obstructing governmental administration (P.L. 195.05) statutes.  This failure caused the violation of Plaintiffs' constitutional rights, including those secured under the First, Fourth, and Fourteenth Amendments.

176.    Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 for the City's failure.

177.    The City of New York knew that the NYPD would encounter significant crowds of protesters seeking to exercise their First Amendment Rights on the First Anniversary of Occupy Wall Street.

178.    The City disregarded significant amount of prior notice and data points reflecting a history of the NYPD's unconstitutional conduct in policing sidewalk protest.

179.    The City chose not to train these officers on how to properly police sidewalk protest and the City chose to remove specifically identified training procedures from its training curriculum, while choosing not to incorporate into, or update, any lesson plan in its ongoing curriculum the standards from a 2007 New York State Court of Appeals decision that concerned the rights of sidewalk protesters, nor incorporating into its ongoing training the standards specifically created for protests during the Republican National Convention that were subsequently disregarded.

180.    Among the specific training materials that were either removed from, or deliberately not included in, the NYPD training curriculum were the RNC Legal Training Guidelines and the classroom training on protest policing as proposed by former Disorder Control Unit Commanding Officer Lieutenant Robert Schwach.

181.    All of these choices constitute and reflect a deliberate indifference by the Defendant City of New York to the rights of sidewalk protesters such as Plaintiffs.

182.    The policing of the First Anniversary of Occupy Wall Street presented officers with difficult decisions which training would make less difficult.  The deliberate choices made by the Defendant which disregarded the obvious consequences that would follow, unsurprisingly resulted

Case 1:20-cv-02610   Document 1   Filed 03/27/20   Page 37 of 38

in the deprivation of protesters' constitutionally protected rights to peacefully protest on the sidewalks in downtown Manhattan.

183.    Furthermore, the members of the NYPD carried out the alleged conduct in their capacities as police officers and under the color of state law, pursuant to the policies, procedures, customs, and/or practices of the Defendant the City of New York and the NYPD.

184.    The failure of the City of New York to update its training on sidewalk protest policing, and to train the Executive Officers in charge of policing the First Anniversary of Occupy Wall Street, led to the violations of each plaintiff's Fourth Amendment rights and their false arrests.

185.    Defendant knew, or should have known, that it was foreseeable that these choices would and did cause Plaintiffs to be injured and damaged as a result of the constitutionally impermissible conduct.

186.    The decisions, actions, and inactions of Defendant and its agents are the legal cause of injuries to Plaintiffs and, as a result, Plaintiffs have sustained general and special damages, as well as incurred attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

## SECOND CLAIM FOR RELIEF

## FALSE ARREST (IN VIOLATION OF THE FOURTH AMENDMENT)

187.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

188.    Plaintiffs were arrested by the members of the NYPD without probable cause, without a warrant, and without each Plaintiff's consent.

189.    As a result of the above constitutionally impermissible conduct, Plaintiffs suffered the violation of civil rights, loss of liberty, and other special damages.

190.    As a result of the police officers' impermissible conduct, Plaintiffs demand judgment against the City of New York in an amount to be determined at trial, together with attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

a)  Award general damages in an amount to be determined by proof at trial;

b)  Award appropriate compensatory damages;

c)  Award attorneys' fees and costs;

d)  Provide such further relief as may be just and proper and in the interests of justice.

DATED:        March 26, 2020
              New York, New York

**WYLIE STECKLOW PLLC**

Wylie M. Stecklow
233 Broadway, Suite 820
New York, New York 10279
Tel.:   (212) 566-8000
Fax:    (212) 202-4952
Wylie@wylielaw.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

 /s/ Jeffrey G. Smith
Jeffrey G. Smith
Kevin G. Cooper
270 Madison Ave.
New York, NY 10016
Tel.:   (212) 545-4600
Fax:    (212) 686-0114
Smith@whafh.com
KCooper@whafh.com

**THE SULTZER LAW GROUP P.C.**

 /s/ Janine Pollack
Janine Pollack (JP0178)
270 Madison Ave., Suite 1800
New York, New York 10016
Telephone: (212) 969-7810
Fax: (888) 749-7747
pollackj@thesultzerlawgroup.com

*Counsel for Plaintiffs*