UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
KEVIN MONAHAN, EMER MCKENNA,
PABLO VARONA BORGES, ANTONIO
SERNA and ROBERT LAMORTE,

                        Plaintiffs,                          20-cv-2610 (PKC)

         -against-                                           OPINION
                                                             AND ORDER

CITY OF NEW YORK,

                        Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

    The five plaintiffs in this case were arrested by members of the New York City

Police Department ("NYPD") during protests of September 17, 2012, which marked the one-year

anniversary of the Occupy Wall Street Movement.  All five were charged with disorderly

conduct under section 240.20 of the New York Penal Law.  The Manhattan District Attorney

declined to prosecute the charges or consented to an adjournment in contemplation of dismissal.

    Plaintiffs bring two claims against the City of New York (the "City") pursuant to

42 U.S.C. § 1983.  First, they assert that they were subject to false arrest in violation of the

Fourth Amendment to the Constitution.  Second, they assert that their arrests occurred because

the City had an official policy, custom or practice of making unconstitutional arrests of

protestors due to the City's deliberate indifference to the inadequate level of training given to

members of the NYPD on the policing of sidewalk protests.  See Monell v. Dep't of Soc. Servs.

of City of New York, 436 U.S. 658, 690 (1978).

    Discovery in this case is now closed, and each side moves for summary judgment

in their favor on certain claims and defenses.  First, plaintiffs move for summary judgment in

their favor on the false arrest claims of plaintiffs Kevin Monahan, Emer McKenna and Pablo

Varona-Borges, while the City moves for summary judgment in its favor on the claims of those

three plaintiffs, plus the claim of plaintiff Robert Lamorte.  Neither side moves for summary

judgment on the false arrest claim of a fifth plaintiff, Antonio Serna.[1]  Video clips are central to

each side's position but they do not present a dispositive portrayal of the facts and circumstances

leading to the arrests.  The clips do show the actual arrests of the plaintiffs.  Because the

intensely fact-specific and disputed false arrest claims are not susceptible to summary

adjudication, a jury must consider the videos and the competing inferences to be drawn from

them, together with the testimony of the witnesses, arrest reports and other evidence.

On the issue of municipal liability, the City's motion for summary judgment will

be granted.  In deciding the City's motion, the Court assumes arguendo that plaintiffs were

falsely arrested in violation of the Fourth Amendment.  Drawing every reasonable inference in

favor of plaintiffs as non-movants, the Court concludes that no reasonable trier of fact could find

that their arrests were a product of the City's deliberate indifference to officer training.  Plaintiffs

have not pointed to evidence that would permit a reasonable trier of fact to conclude that the City

was on notice that NYPD members were unconstitutionally making false arrests on disorderly

conduct charges, to such an extent that the alleged failure to train officers amounted to an official

policy, practice or custom.  Plaintiffs also have not identified a specific training deficiency that is

closely connected to their injuries.  Far from being deliberately indifferent to member training,

some of the evidence cited by plaintiffs reflects that senior NYPD leadership was attentive to the

importance of training on the policing of large-scale protests.

---

[1] There is no video of Serna's arrest.

Plaintiffs' summary judgment motion will therefore be denied in its entirety, and defendants' motion will be granted but only on the issue of municipal liability.

BACKGROUND.

On September 17, 2012, marchers gathered in lower Manhattan to mark the one-year anniversary of the Occupy Wall Street movement.  (Def. 56.1 ¶¶ 2-3; Pl. 56.1 Resp. ¶¶ 2-3.) The five plaintiffs in this case were all present at the protest, and each of them was arrested and charged with disorderly conduct under New York Penal Law section 240.20.

As will be discussed in further detail below, Monahan and McKenna were arrested less than a minute apart.  They were both in a group that had gathered near the entrance of an office building at 100 Broadway and were arrested as the NYPD was clearing sidewalk space in front of a TD Bank branch.  (Def. 56.1 ¶¶ 3, 6; Pl. 56.1 ¶¶ 3, 6.)  The video begins shortly before the NYPD cleared the sidewalk and about 30 seconds before Monahan's arrest. (Brocker Dec. Ex. A; Stecklow Dec. Ex. 175.)  As depicted in the video, immediately prior to Monahan's arrest, he is standing directly in front of an NYPD sergeant who motions with her arms for the crowd to move back.  (Brocker Dec. Ex. A at 0:27-0:30.)  The video does not record any audible dispersal orders that were issued to the crowd, but a declaration submitted by Monahan's arresting officer states that a Captain Duffy issued dispersal orders through a bullhorn, as do Monahan's arrest records.  (Pajak Dec. ¶¶ 8-9, at Docket # 44-3; Stecklow Dec. Ex. 170.)  In his deposition testimony, Monahan testified that he did not know if he "heard anything specifically" because "[t]here was lots of shouting" but also that "I believe it was because the police ordered everybody to turn around and go the other way, and then upon turning around to go the other way we were surrounded by police."  (Stecklow Dec. Ex. 176 at 51.) Monahan was charged with disorderly conduct under New York Penal Law § 240.20(5) and (6),

and the Manhattan District Attorney's Office declined to prosecute him.  (Stecklow Dec. Ex. 170.)

McKenna was arrested less than a minute after Monahan.  (Brocker Dec. Ex. A at 1:20-1:40.)  As shown in the video, she is standing calmly on the edge of the crowd, a few feet from where McKenna had been arrested.  (Id.)  According to the City, McKenna had ignored officer orders to disperse and was one of few individuals who remained after the crowd had retreated, characterizations that plaintiffs dispute.  (Def. 56.1 ¶¶ 14-15; Pl. 56.1 Resp. ¶¶ 14-15.)  The video shows officers bringing McKenna forward from the crowd of protestors and restraining her wrists with ties.  (Ex. A at 1:20-1:40.)  McKenna's arresting officer claimed that McKenna had been on the sidewalk for approximately twenty minutes prior to her arrest and was part of a crowd obstructing pedestrian movement on the sidewalk.  (Stecklow Dec. Ex. 169.)  McKenna was charged with disorderly conduct under section 240.20(5), and the charge was ultimately adjourned in contemplation of dismissal.  (Id.)

Plaintiff Pablo Varona-Borges participated in the protest as part of a marching band called the Bread and Puppet Band.  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32; Pl. 56.1 ¶ 231; Def. 56.1 Resp. ¶ 231.)  Video depicts a band playing "When the Saints Go Marching In" while under sidewalk scaffolding, although the band is largely obscured by marchers in the foreground. (Brocker Dec. Ex. I.)  The parties do not dispute that Varona-Borges was waving a red-and-white flag and dancing, although the identity of the flag-waver is not apparent in the videos.  (Pl. 56.1 ¶ 229; Def. 56.1 Resp. ¶ 229; Def. 56.1 ¶¶ 33-34; Pl. 56.1 ¶¶ 33-34; Brocker Dec. Exs. H, I.)  At the start of the video, a white-shirted officer, likely signifying a rank of lieutenant or higher, can be heard announcing to the crowd through a bullhorn, "you will be placed under arrest," but any preceding words are not in the video clip.  (Brocker Dec. Ex. H.)  According to the City, Varona-

Borges and others in his group were obstructing access to the Wall Street subway station.  (Def. 56.1 ¶ 37.)  The City asserts that Deputy Inspector William Gardner arrested Varona-Borges due to his failure to move clear of the subway entrance.  (Def. 56.1 ¶ 38.)  A video depicts officers leading Varona-Borges out of a crowd and tying him at the wrists before they then lead him off camera.  (Brocker Dec. Ex. I.)  The video shows little, if anything, about Varona-Borges's actions prior to the point in time when he was led out of the crowd and arrested.  (Brocker Dec. Ex. I.)  He was charged with disorderly conduct under sections 240.20(5) and (6), and the charges were later adjourned in contemplation of dismissal.  (Stecklow Dec. Ex. 163; Ex. 172 at 66.)

Plaintiff Robert Lamorte was arrested near the intersection of Beaver Street and William Street.  (Brocker Dec. Exhibit E; Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19.)  Video shows Lamorte standing on the edge of a sidewalk amid a crowd of marchers and photographers.  (Id.)  Through a bullhorn, an officer tells the crowd, "You have to let traffic through.  Everyone keep moving.  Let's go.  You're blocking the traffic.  Everyone keep moving."  (Id. at 0:07-0:12.)  As the camera pans, Lamorte briefly drops out of frame, and when he re-appears, he seems to be pacing in front of the crowd, shouting something unintelligible through cupped hands.  (Id. at 0:14-0:16.)  A white-shirted officer then places his hands on Lamorte's shoulders and Lamorte appears to drop to the ground.  (Id. at 0:16-0:17.)  The camera does not clearly depict the events immediately following, as it first pans over the crowd, and then shows the backs of NYPD officers and other protestors apparently being restrained.  (Id. at 0:18-1:36.)  Amid the commotion, Lamorte briefly appears on camera while lying on the ground.  (0:40, 1:07.)  Around the 1:36 mark of the video, Lamorte is partially visible on the far-left side of the screen, lying on the ground and apparently restrained at the wrists.  (Id. 1:36-38.)  He was charged with

disorderly conduct under section 240.20(5), and the charge was adjourned in contemplation of dismissal.

Serna, as to whom neither side seeks summary judgment, alleges that he was falsely arrested under section 240.20(5) and (6), and the charges were adjourned in contemplation of dismissal.

In addition to asserting that they were falsely arrested, plaintiffs urge that the arrests occurred as a result of the City's failure to train members of the NYPD, specifically including its executive officers, on the policing of sidewalk protests and how to recognize probable cause for arrests of individuals on disorderly conduct charges. According to plaintiffs, the City had actual or constructive notice that the training given to NYPD members was deficient but was deliberately indifferent to those deficiencies, thereby adopting a policy, practice or custom of falsely arresting protestors on disorderly conduct charges and violating their Fourth Amendment rights. See generally Connick v. Thompson, 563 U.S. 51 (2011). Defendants move for summary judgment in their favor on plaintiffs' municipal liability claim. As will be explained in detail, the wide assortment of evidence offered by plaintiffs in opposition falls far short of the "stringent" standard required of a plaintiff to demonstrate a municipality's deliberate indifference to a failure in officer training. The City's summary judgment motion will therefore be granted on the issue of municipal liability.

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A

dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'"  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

In certain circumstances, video evidence may be so clear and unambiguous that a court deciding a summary judgment motion may rely solely on the video, and need not afford weight to conclusory or non-credible assertions that are inconsistent with the "blatant" video evidence.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007).  In Scott, the Supreme Court concluded that, at summary judgment, the appellate court afforded undue weight to the non-

movant's account of his cautious and careful driving, despite video evidence that "more closely resembles a Hollywood-style car chase of the most frightening sort . . . ."  In discussing the parties' burdens, the Court stated: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id. at 380; see also Pratt v. Nat'l R.R. Passenger Corp., 709 Fed. App'x 33, 34 (2d Cir. 2017) (concluding that "objective video and data evidence furnished by the Defendants on summary judgment was sufficient to overcome all contrary eyewitness testimony and preclude any genuine dispute of material fact as to the train's speed and horn blasts.") (summary order).  As will be discussed, the video evidence in this case is not nearly so clear-cut as the video described in Scott, and, in some instances, the videos make little sense without reference to other parts of the summary judgment record.  As Judge Gardephe has explained: "The mere existence of a videotape in the record depicting some or all of the events in dispute is not dispositive.  . . . While video evidence submitted by the parties should certainly be considered and carefully reviewed, summary judgment is appropriate only where the video evidence in the record is sufficient to blatantly contradict one party's versions of events."  Davis v. Murphy, 2018 WL 10070524, at *5 (S.D.N.Y. Sept. 24, 2018) (quotation marks, alterations and citations omitted).

Lastly, the Court notes that in support of their summary judgment motion, plaintiffs have submitted a Local Civil Rule 56.1 statement that contains 286 paragraphs of purportedly material facts, backed by declarations that annex 185 exhibits.[2]  In their opposition to the City's motion, plaintiffs rely upon their own Rule 56.1 statement and the evidence cited therein.  In reviewing the City's motion directed to plaintiffs' failure-to-train claim, the Court

---

[2] Additionally, the Stecklow Declaration does not describe or identify its annexed exhibits, and merely catalogs them using a Bates-number range.  (Docket # 56.)

will, at times, rely on portions of the record not specifically cited by plaintiffs in opposition, doing so in the light most favorable to plaintiffs in an attempt identify evidence that may support their claims.  The Court notes, however, that in deciding a summary judgment motion, it "is not required to scour the record on its own in a search for evidence when the plaintiffs fail to present it."  CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 125 (2d Cir. 2013) (quotation marks omitted); accord ABC v. NYU Hosps. Ctr., 629 Fed. App'x 46, 49 (2d Cir. 2015) (summary order).

DISCUSSION.

I.      The Parties' Summary Judgment Motions Directed toward the Probable Cause to
        Arrest the Individual Plaintiffs Will Be Denied.

        A.   Legal Standard.

        The Fourth Amendment guarantees the right of an individual to be free from unreasonable seizures, including arrest without probable cause.  See, e.g., Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  "To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that the defendant intentionally confined him without his consent and without justification.  Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff."  Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (citations and quotation marks omitted).  "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.  To assess probable cause, a court considers only the facts available to the officer at the time of the arrest and immediately before it."  Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (internal citation and quotation marks omitted).  "The law has long recognized that probable

cause does not demand evidence of every element of a crime – not even to support a person's arrest."  Ganek v. Leibowitz, 874 F.3d 73, 86 (2d Cir. 2017).

> All plaintiffs were arrested on disorderly conduct charges.  Under New York law, "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . 5. He obstructs vehicular or pedestrian traffic; or 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . ."  N.Y. Penal L. § 240.20(5), (6).  The crime of disorderly conduct requires "a culpable mental state to create a public disturbance." People v. Tichenor, 89 N.Y.2d 769, 775 (1997).  "[T]he risk of public disorder does not have to be realized but the circumstances must be such that defendant's intent to create such a threat (or reckless disregard thereof) can be readily inferred."  People v. Baker, 20 N.Y.3d 354, 360 (2013).  "The significance of the public harm element in disorderly conduct cases cannot be overstated.  In virtually all of our prior decisions, the validity of disorderly conduct charges has turned on the presence or absence of adequate proof of public harm."  Id.  In determining the risk of disorder, "New York courts consider 'the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances.'"  Kass v. City of New York, 864 F.3d 200, 213 (2d Cir. 2017) (quoting Baker, 20 N.Y.3d at 360).

> The application of section 240.20(5) is fact intensive, and focuses on the extent to which a defendant impeded movement and caused serious annoyance.  For example, the New York Court of Appeals has concluded that standing in the middle of a sidewalk at 2:01 a.m. did not show an intent to risk public inconvenience, annoyance or alarm, because the statute is

directed toward "considerably more serious" conduct.  People v. Jones, 9 N.Y.3d 259, 262

(2007).  "Otherwise, any person who happens to stop on a sidewalk – whether to greet another,

to seek directions or simply to regain one's bearings – would be subject to prosecution under this

statute."  Id.; see also Kass, 864 F.3d at 213 (recounting plaintiff's "hostile and resistant"

demeanor toward officers and presence on "public sidewalk where pedestrians were passing, at a

time of day when the sidewalks might shortly become more congested, and in close proximity to

a public protest" as evidence supporting probable cause to arrest on disorderly conduct charges);

People v. Tardif, 58 Misc.3d 31 (Appellate Term 1st Dep't 2017) (defendant was properly

charged with disorderly conduct when charging instruments alleged that she congregated in a

group on the sidewalk while jumping up and down, causing passersby to walk in the street, and,

separately, blocked pedestrian traffic at a building entrance after being told to disperse, causing

"two or three" people to use alternate doors); People v. Barrett, 821 N.Y.S.2d 416, 430-31 (N.Y.

Crim. Ct. N.Y. Cnty. 2006) (dismissing disorderly conduct charge where bicyclists riding four

abreast did not obstruct vehicular traffic); People v. Berardi, 690 N.Y.S.2d 916, 923-24 (N.Y.

Crim. Ct. N.Y. Cnty. 1999) (information adequately charged disorderly conduct when it alleged

defendant chained herself to a metal pipe on a sidewalk and obstructed pedestrian traffic during a

protest); People v. Maher, 520 N.Y.S.2d 309, 313 (N.Y. Crim. Ct. N.Y. Cnty. 1987) (sole

sidewalk protestor who blocked doorway to abortion clinic and refused officer instructions ten

times was guilty of disorderly conduct); People v. Carcel, 3 N.Y.2d 327, 331 (1957) (leafletters

peacefully marching outside United Nations entrance and not obstructing pedestrian traffic did

not cause serious annoyance to pedestrians).

          As to section 240.20(6), "the gravamen of the offense in that case is not so much

the conduct of the defendant as it is the refusal to desist from that conduct after being ordered to

by the police." Carcel, 3 N.Y.2d at 333.  "This offense consists of the following elements: the individual (1) congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted with intent to cause or recklessly created a risk of public inconvenience, annoyance or alarm." Kass, 864 F.3d at 211. "'[A] refusal to obey such an order [to move] can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order.'" Id. (quoting People v. Todaro, 26 N.Y.2d 325, 328-29 (1970)).  However, a protestor's assertion of a right to remain and refuse a dispersal order does not defeat probable cause.  Rivera v. City of New York, 40 A.D.3d 334, 338 (1st Dep't 2007).  In weighing whether a person refused to comply with a dispersal order, courts should look to whether "the police communicated their orders to the entire crowd" and whether demonstrators were given an opportunity to comply and refused to do so.  Dinler v. City of New York, 2012 WL 4513352, at *10 (S.D.N.Y. Sept. 30, 2012) (Sullivan, J.).

> **B.  The Summary Judgment Motions Directed toward Probable Cause to Arrest Monahan Will Be Denied.**

Plaintiffs Monahan and McKenna were arrested on disorderly conduct charges less than a minute apart and a few feet away from each other and the arrests were recorded in the same video clip.  Both sides move for summary judgment in their favor.

The Court separately considers the motions related to Monahan and McKenna, but each of them will be denied for similar reasons.  When considered with other evidence submitted in connection with the motion, the video offers only a partial depiction of the events surrounding the arrest.  The video does not show whether and how a claimed dispersal order was issued, how long the crowd had remained at that location, and the crowd's ability to move back

on the sidewalk when instructed to do so, among other things.  A reasonable jury could draw different conclusions on whether probable cause is established from the totality of the evidence.

In a declaration submitted for this action, the arresting officer Allan Pajak states that he observed protestors blocking the flow of pedestrian traffic on the sidewalk in front of 100 Broadway and heard Captain Duffy issue a dispersal order via bullhorn.  (Pajak Dec. ¶¶ 8-9, at Docket # 44-3.)  No such order to disperse is audible in the video, although such an order may have preceded the video clip, which begins about twenty seconds before officers began to clear sidewalk space.  (Brocker Dec. Ex. A.)  The arrest report for Monahan states, "At T/P/O deft was observed by A/O obstructing pedestrian traffic on public sidewalk after a lawful order given by Capt to disperse.  Duffy by blowhorn."  (Stecklow Dec. Ex. 170.)  A declaration submitted by Inspector Maximo Talentino states that "a large crowd was on the sidewalk blocking the entrance of a bank" and that the crowd did not move after being directed by officers to "go back the other way."  (Tolentino Dec. ¶¶ 4, 6-7, at Docket # 47-2.)

Pajak states that, as is reflected in the video, a sergeant standing directly in front of plaintiff Monahan gestured with her hands and arms for the protestors to move in the opposite direction.  (Pajak Dec. ¶ 12; Brocker Dec. Ex. A at 0:27-0:31.)[3]  At least one white-shirted officer appears to be shouting instructions to the crowd, and the sergeant who gestures with her arms appears to be speaking, but their words are not audible in the video.  (Id. at 0:27-0:37.) Monahan testified in his deposition that it was difficult to hear police instructions, but his testimony also suggests that some type of dispersal order might have been announced:

> I don't know if I heard anything specifically.  There was lots of shouting.  Most of what I heard was the people nearest me shouting. . . .  I believe it was because the police ordered everybody to turn around and go the other way, and then upon turning around to go the other way we were surrounded by police.  . . .  Nobody really

---

[3] In the video, Monahan has long, dark hair, dark sunglasses, facial hair, a black T-shirt and a large gray backpack.

knew what to do, and we didn't have time to respond before I was
arrested.

(Stecklow Dec. Ex. 176 at 51.)

The video reflects that around the time of Monahan's arrest, the crowd is facing
the officers and appears to be fairly calm and orderly, as if awaiting further instruction or
perhaps permission to proceed.  (Brocker Dec. Ex. A at 0:27-0:37.)  Video footage shows an
officer gesturing with her hands and arms for the crowd to move back.  (Brocker Dec. Ex. A at
0:27-0:30.)  The video shows plaintiff Monahan standing two or three feet in front of the officer,
with an unobstructed view of her motions.  (Id.)  For approximately four seconds, Monahan is
not shown in the video frame as the camera pans to the left, then the video shows him being
brought forward and restrained with plastic ties around his wrists, while Monahan shouts to the
crowd: "My name is Kevin Monahan.  I didn't do anything.  They picked me out of the crowd at
random."  (Id. at 0:31-1:00.)  Other apparent protestors are then shown being restrained at the
wrists.  (Id. at 1:01-2:00.)

Additional videos submitted by plaintiffs do not shed significant light on the
arrest of Monahan.  One video was taken from an overhead angle from about a half-block away
and appears to come from a fixed security camera.  (Stecklow Dec. Ex. 171.)  At a time stamp of
approximately 4:33:30 PM, NYPD officers first move to clear space in front of the TD Bank
branch.  Any details about the arrests of McKenna and Monahan are not apparent from the video
and the video has no audio.  By the time stamp of 4:36:00 PM, it appears that officers have fully
cleared the sidewalk in front of the TD Bank branch.  Two other videos purport to show that the
location of officers interfered with the protestors' ability to disperse, but they are similarly
unclear.  (Pl. 56.1 ¶¶ 240, 244; Stecklow Dec. Exs. 168, 174.)

A "Declination of Prosecution" form created by the Manhattan District Attorney's Office stated:

> Police Officer Allan Pajak, Shield 29343 of the Brooklyn North Task Force, observed the defendant as a part of a large group of pedestrians walking on the sidewalk, blocking pedestrian traffic. Another officer shouted on a blowhorn for them to disperse. The defendant was then observed walking in the opposite direction of the large group. The defendant was placed under arrest for blocking pedestrian traffic. Based on these set of facts, the People decline to prosecute at this time.

(Stecklow Dec. Ex. 170.)

As noted, "[t]o assess probable cause, a court considers only the facts available to the officer at the time of the arrest and immediately before it." Kee, 12 F.4th at 158. Plaintiffs assert that, based on the video submitted as Exhibit A of the Brocker Declaration, no reasonable trier of fact could conclude that there was probable cause to arrest Monahan on disorderly conduct charges, characterizing the video as "crystal clear" and describing the City's account as "visible fiction." (Pl. Reply at 8.) While the video may be important evidence of the arrest, it is not so clear as plaintiffs suggest, particularly when weighed with other evidence in the summary judgment record. A trier of fact must review the video evidence alongside other evidence, including the statements of Pajak, who stated that he "observed and heard Captain Duffy issue an order to disperse to the protestors via a bullhorn." (Pajak Dec. ¶ 9.) A reasonable jury crediting Pajak's account could conclude that a reasonable officer had probable cause to arrest Monahan under section 240.20(6) for failing to comply with a lawful order to disperse, especially considering his proximity to the officer who gestured for the crowd to move back. A reasonable jury could also conclude that there was no such order, or that the arresting officer did not have a basis to believe that the order was effectively communicated to the crowd, in which case, it might reasonably conclude that Monahan was arrested without probable cause.

Similarly, the video provides some evidence on whether the protestors impeded pedestrian traffic on the sidewalk, but a trier of fact should determine the extent to which the arresting officer had probable cause to arrest Monahan under section 240.20(5) for obstructing pedestrian traffic with the intent or risk of causing public inconvenience, annoyance or alarm. The parties dispute whether the crowd of marchers blocked the entrances of the TD Bank branch and 100 Broadway and whether the NYPD officers cleared the sidewalk in order to create a path for entry and exit.  (Def. 56.1 ¶¶ 6-7; Pl. 56.1 Resp. ¶¶ 6-7.)  The entry to 100 Broadway seldom appears in the video, but the entry to TD Bank is in the background throughout.  (Brocker Dec. Ex. A.)  A reasonable jury could conclude that the protestors were not intentionally blocking access to the bank, and a customer would have been physically capable of entering or exiting through the doors and maneuvering through the crowd.  A reasonable jury could also conclude that a person wishing to enter or exit the TD bank would have struggled to navigate the tight crowd and may have reasonably opted not to do so.  See Tardif, 58 Misc.3d at 31 (disorderly conduct charge supported when "two or three" people opted to use alternate doors).

It also is not apparent from the video whether the protestors were moving up Broadway or whether movement had stalled.  Monahan's above-quoted deposition testimony indicated that he was part of a group whose movement had been stymied in both directions by the NYPD, which would weigh against a finding of probable cause for either disorderly conduct charge.  But the ease of movement for the crowd of protestors and whether they were able to comply with a dispersal order is not apparent from the videos.  A trier of fact must determine whether Monahan was able to comply with any dispersal order.

Because a jury must weigh the evidence surrounding Monahan's arrest, including whether to credit Pajak's testimony and statements, the summary judgment motions will be denied.

### C.  The Summary Judgment Motions Directed toward Probable Cause to Arrest McKenna Will Be Denied.

McKenna's arrest took place less than a minute after Monahan's.  McKenna was arrested for obstructing pedestrian traffic under section 240.20(5).  Much of the preceding discussion concerning the video of Monahan's arrest also applies to McKenna's.[4]  A criminal complaint filed by Officer Melinda Simpson charged McKenna with one count of disorderly conduct under Penal Law section 240.20(5), stating in part, "I observed the defendants for a period of approximately twenty minutes standing on the sidewalk at the above location with approximately one hundred other individuals.  I observed that the defendants along with the other individuals were blocking the entire width of the sidewalk and that pedestrians could not use the sidewalk.  I observed several pedestrians have to walk into the street in order to get around the defendants."  (Stecklow Dec. Ex. 169.)  In her deposition, McKenna testified that she did not remember how long she had been standing at that location, and indicated that it could have been from around five minutes to less than an hour.  (Stecklow Dec. 178 at 66.)

The arrest report for McKenna states: "At T/P/O A/O OBSERVED DEFT. ON Public Sidewalk Blocking Pedestrian Traffic."  (Stecklow Dec. Ex. 164.)  The Manhattan District Attorney Datasheet relating to McKenna includes the following bullet points:

-Over 100 people on the sidewalk
-AO obs the Ds as part of this group
-Ds were standing on the sidewalk
-AO obs pedestrians going into the street to get around the Ds

---

[4] In the video, McKenna is wearing a black-and-white patterned dress, large sunglasses, and is carrying a black-strap knapsack over her shoulder.

-AO obs the D's for a period of approx. 20 minutes standing and
blocking pedestrian traffic

(Stecklow Dec. Ex. 169.)

As depicted in the video clip, McKenna is standing toward the front of the crowd after sidewalk space has been cleared in front of the TD Bank branch.  McKenna appears to be passively observing the arrest of Monahan and another individual when officers pull her forward and place restraints on her wrists.  (Id. at 0:27-1:21.)  McKenna states in a calm tone, "I'm not resisting arrest.  I'm not resisting," as the officers restrain her wrists with plastic ties.  (Id. at 1:21-1:27.)  The City asserts that McKenna "was one of only a few individuals" who remained standing on the sidewalk and ignored officers' orders (City Mem. at 8), but the angle and perspective of the video makes it difficult to determine the density and depth of the crowd behind her.  (Id. at 0:27-1:27.)  It is not apparent from the video whether McKenna chose to remain in place, in defiance of any instruction, or whether she happened to be toward the front of a dense crowd when the NYPD cleared space near the TD Bank entrance.  McKenna testified in her depositions that she couldn't recall whether she heard dispersal orders but that the announcements were "very hard to understanding."  (Stecklow Dec. Ex. 178 at 70.)  In a deposition, Chief Thomas Purtell, the NYPD's incident commander on September 17, 2012, testified that he "did not see disorderly conduct in that – in this video" and also stated "I'm not aware of what transpired previously."  (Pl. 56.1 ¶ 214; Def. 56.1 Resp. ¶ 214.)  The summary judgment record does not appear to include deposition testimony from McKenna or a declaration that sets forth her version of events.

Of the five plaintiffs, the video evidence relating to McKenna gives the clearest picture of the events immediately preceding her arrest.  Based solely on the video, it appears that McKenna happened to be on the edge of the crowd when NYPD members moved in to clear

space, and that she was taken into custody merely for being in the wrong place at the wrong time. However, if a trier of fact were to credit Pajak's testimony that Captain Duffy issued dispersal orders, and that a reasonable officer had reason to believe that McKenna had failed to disperse, that would weigh in favor of a finding of probable cause to arrest her.  In addition, the angle and perspective of the video makes it difficult to discern whether, as the City urges, McKenna was one of a few people who opted not to move back when instructed, or whether she was at the front of a densely packed crowd and was unable to move.  The video evidence of McKenna's arrest raises a somewhat closer question as to whether she was arrested without probable cause, but a trier of fact is still required to weigh additional evidence as to the announcement of any dispersal order and determine whether the crowd flow made it possible for McKenna to disperse when instructed to do so.

Because a jury must decide whether to credit Pajak's testimony and statements of events not seen or heard in the video, the summary judgment motions relating to the arrest of McKenna will be denied.

> D.  The Summary Judgment Motions Directed toward Probable Cause to Arrest <u>Varona-Borges Will Be Denied.</u>

Varona-Borges was arrested earlier in the day and at a different location.  Again, both sides urge that the Court should grant summary judgment in their favor based on a video clip of his arrest.  But the video clip shows Varona-Borges being led out of a crowd and restrained at the wrists, followed by officer instructions for marchers to keep moving.  The videos show little beyond the fact that Varona-Borges was arrested.  A trier of fact must weigh the videos alongside other evidence in order to conclude whether the arresting officers had probable cause to arrest Varona-Borges.

Varona-Borges participated in the march as part of a group called the Bread & Puppet group, which featured a marching band.  (Pl. 56.1 ¶ 231; Def. 56.1 Resp. ¶ 231.)   The parties point to two videos that purport to show the circumstances of Varona-Borges's arrest. (Brocker Dec. Exs. H, I.)  One video starts with an officer in mid-sentence speaking the phrase "placed under arrest" through a megaphone at the intersection of Broadway and Exchange Place. (Brocker Dec. Ex. H.)  At some distance, red-and-white flags are being waved near scaffolding and musical instruments are visible nearby.  (Id.)  The second video shows some of the same red-and-white flags being waved next to a sidewalk subway entrance and under scaffolding. (Brocker Dec. Ex. I.)  A marching band plays "When the Saints Go Marching In."  (Id.)  About four seconds into the video, one of the flags is lowered, and officers lead Varona-Borges out of the crowd and restrain his wrists.  (Id. at 0:04-0:25.)  The video does not offer a clear depiction of events leading up to his arrest, aside from a plausible inference that Varona-Borges was carrying a flag.

After Varona-Borges is led off camera, an officer speaking through a megaphone says, "Continue moving.  If you do not you will be arrested.  Continue moving."  (Id. at 0:30-0:36.)  A few seconds later, a man whose shirt reads "NYPD Community Affairs" appears on camera and says through a megaphone, "Continue moving.  Do not block the sidewalk."  (Id. at 0:41-0:46.)  A different officer says through a megaphone says, "Ladies and gentlemen, you need to keep everyone on the sidewalk."  (Id. at 0:50-0:52.)  The video shows the crowd proceeding north on Broadway.  (Id. at 0:50-1:10.)

Arrest paperwork states that prior to his arrest, officers first observed Varona-Borges obstructing vehicular traffic, then later obstructing pedestrian traffic after refusing an order to disperse.  The arrest form for Varona-Borges completed by officer Pom Erwin

Arrunategui states, "At T/P/O I observed deft with numerous others Blocking vehicular traffic and Pedestrian traffic.  At which Time Captain Gardner gave warnings to disperse on bullhorn Deft still refused to leave and was placed under arrest for DISCON."  (Stecklow Dec. Ex. 163.) The criminal complaint signed by Arrunategui charged Varona-Borges with one count of disorderly conduct under section 240.20(5) and one count under section 240.20(6).  (Stecklow Dec. Ex. 162.)  It stated that Arrunategui observed Varona-Borges at the intersection of Wall Street and Broadway "standing in the middle of the street at the above named location.  I observed that traffic was very congested and that there were approximately four (4) blocks filled with cars and that said cars were unable to move around the defendant."  It continued:

> I observed that the defendant was causing drivers annoyance and alarm in that I observed multiple drivers yelling and heard car horns honking.  I observed Captain William Gardner, shield number 20756 of the Patrol Brooklyn North, state in substance: AT THIS TIME, YOU MUST CLEAR THE AREA.  I observed that the defendant would not leave the area.  Approximately five to six (5-6) minutes later, I observed the defendant move to the sidewalk and observed that he was blocking pedestrian traffic in that multiple people were unable to walk around the defendant who was blocking the sidewalk with several unidentified protestors.
>
> Approximately five to six (5-6) minutes later, I heard another directive warning the defendant in substance that he would be arrested if he did not leave the area.  I observed that the defendant did not leave the area.

(Stecklow Dec. Ex. 162; Pl. 56.1 ¶¶ 222-23; Def. 56.1 Resp. ¶¶ 222-23.)

A declaration submitted by Deputy Inspector William Gardner in connection with this litigation states that at the time of Varona-Borges's arrest, Gardner was addressing large crowds of protestors and instructing them to keep moving.  (Gardner Dec. ¶ 4, at Stecklow Dec. Ex. 161.)  Gardner states that he approached Varona-Borges when he was waving a flag next to a subway station stairwell after Varona-Borges was pointed out by other officers.  (Id. ¶ 6.)  He

states that several apparent commuters stepped onto the street to avoid Varona-Borges.  (Id. ¶ 7.)
Gardner states that he had a discussion with Varona-Borges, after which he removed him from
the crowd, and that Officer Erwin Arrunategui administered handcuffs.  (Id. ¶ 8.)  Plaintiffs
observe that Gardner did not mention having observed Varona-Borges obstructing vehicle traffic.
(Pl. 56.1 ¶ 225.)  Plaintiffs specifically urge that Gardner's declaration "should not be credited"
because it is inconsistent with aspects of the video.  (Pl. Mem. at 13.)

    The video of Varona-Borges illuminates little about the circumstances leading up
to his cuffing and arrest.  It shows a tightly packed crowd under sidewalk scaffolding near a
subway entrance, with red-and-white flags visible.  After an officer moves into the crowd, a flag
lowers, Varona-Borges is led out, and his wrists are restrained.  A reasonable trier of fact could
not discern from the video whether, prior to his arrest, Varona-Borges was in compliance with
officer instructions or whether he was willfully obstructing pedestrian traffic near a subway
entrance, in defiance of police instruction.  Further, while the video does not show any dispersal
order or instruction to keep moving immediately prior to the arrest, the video then shows officers
issuing instructions every few seconds for the crowd to keep moving.  In conjunction with other
evidence, a reasonable jury could, but need not, infer that similar instructions preceded the arrest.

    Based solely on the video evidence, a reasonable trier of fact would struggle to
discern the actions of Varona-Borges that preceded his arrest, and would be unable to determine
the existence or lack thereof for any officer's probable cause for arresting him on disorderly
conduct charges.  The parties' summary judgment motions will therefore be denied as to the
arrest of Varona-Borges on disorderly conduct charges.

E.  The City's Summary Judgment Motions Directed toward Probable Cause to Arrest Lamorte Will Be Denied.

The City urges that, based on the video of Lamorte's arrest, no reasonable trier of fact could conclude that he was arrested without probable cause.  Lamorte does not move for summary judgment in his favor.  Because a trier of fact must weigh the evidence related to Lamorte's arrest, the City's motion will be denied.

The video of Lamorte's arrest is particularly unclear and chaotic.[5]  (Brocker Dec. Ex. E.)  It first shows Lamorte apparently on or near the edge of the sidewalk, casually milling around a crowd of marchers and photographers.  (Id. at 00:00-0:12.)  Through a bullhorn, an officer announces to the crowd, "You have to let traffic through.  Everyone keep moving.  Let's go.  You're blocking the traffic.  Everyone keep moving."  (Id. at 0:07-0:12.)  Lamorte drops out of frame as the camera pans left, and when he re-appears on camera, he appears to shout something unintelligible through cupped hands.  (Id. at 0:15-0:17.)  A white-shirted officer then places his hands on Lamorte's shoulders, at which point Lamorte appears to drop to the ground.  (Id. at 0:16-0:17.)  The camera does not depict the events immediately following, as it first pans over the crowd and photographers, and then shows the backs of NYPD officers while some protestors seem to jostle near the sidewalk curb.  (Id. at 0:18-1:36.)  At later points, Lamorte seems to briefly appear on camera while lying on the ground.  (0:40, 1:04-1:07.)  Around the 1:36 mark of the video, Lamorte is partially visible on the far-left side of the screen, lying chest-down on the ground and apparently being restrained at the wrists.  (Id. 1:36-38.)  Lamorte was charged with disorderly conduct under sections 240.20(5) and (6), and the charge was disposed of with an adjournment in contemplation of dismissal.

_____

[5] Lamorte is wearing a black shirt and pants with a black handkerchief on his head, and is carrying a beige backpack with what appears to be a magenta sleeping bag or blanket.

The arrest report for Lamorte states: "At T/P/O deft was part of OWS demonstration and was given a lawful order by LT Nylus [sic] (NYPD) to leave street and return to sidewalk and didn't return to sidewalk and was placed under arrest at scene without incident. A/O was informed by LT Nylus."  (Brocker Dec. Ex. F.)

The City also relies on a declaration submitted by NYPD Captain Brian Nyhus. (See Brocker Dec. Ex. G.)  Nyhus states that he was present for the arrest of Lamorte and that he provided the information used to complete Lamorte's arrest report.  (Nyhus Dec. ¶¶ 2, 21.) Nyhus describes why he concluded that there was probable cause to arrest Lamorte, but aspects of his declaration are unclear, and his testimony should be weighed by a trier of fact alongside the video clip.  Nyhus states that he "may have" given dispersal orders through a megaphone, but in the next paragraph states that he gave dispersal orders and that Lamorte ignored them; a blank paragraph number is between the two statements.  (Nyhus Dec. ¶¶ 12-14.)  Nyhus's statement that he "may have" given a dispersal order is in tension with his assertion that he actually issued a dispersal order, which Lamorte ignored, and the blank paragraph in between suggests a possible editing error that may have omitted important context as to any dispersal order. Separately, Nyhus's declaration states that Lamorte was part of a group that was present in the street and blocking a van's ability to make a turn.  (Nyhus Dec. ¶¶ 7-9.)  However, the video suggests that at the time of his arrest, Lamorte was standing on the sidewalk, or, at the least, barely off the curb's edge, and there is no indication that he or the crowd were blocking vehicular traffic.  The Nyhus Declaration is unclear on whether Nyhus is asserting Lamorte was arrested at a point in time where he was obstructing traffic or whether the arrest happened sometime later.  Drawing every reasonable factual inference in favor of Lamorte as the non-movant and considering the lack of clarity as to whether Nyhus actually issued dispersal orders

and directed Lamorte's arrest at a time when he was blocking traffic the City's summary

judgment motion will be denied as to Lamorte's false arrest claim.

II.     The City's Summary Judgment Motion on Plaintiffs' Municipal Liability Claim Will
        Be Granted.

        A.     Overview of Plaintiffs' Municipal Liability Claim.

        Plaintiffs separately assert that the City failed to train "executive members" of the

NYPD on the application of the disorderly conduct statute to sidewalk protests and the

protections afforded by the First and Fourth Amendments.[6]  According to plaintiffs, the City's

failure to properly train NYPD members reflects a deliberate indifference to the rights of

protestors and amounts to municipal policy.  Both plaintiffs and the City move for summary

judgment in their favor on the municipal liability claim.

        Because plaintiffs' motion for summary judgment is denied on the issue of

whether Monahan, McKenna and Varona-Borges were falsely arrested, plaintiffs have not

demonstrated a constitutional violation at this stage.  The Court therefore does not reach

plaintiffs' summary judgment motion on municipal liability.  See, e.g., Segal v. City of New

York, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no

underlying constitutional violation, its decision not to address the municipal defendants' liability

under Monell was entirely correct.").

        The City also moves for summary judgment on plaintiffs' claim of municipal

liability.  It urges that even if plaintiffs were falsely arrested in violation of the Fourth

Amendment, no reasonable trier of fact could conclude that the arrests of plaintiffs occurred

because the City had an official policy, custom or practice of making unconstitutional arrests of

---

[6] Plaintiffs' summary judgment papers do not appear to define the term "executive members," but their complaint defines "Executive Officers" as those ranked captain and higher.  (Compl't ¶ 64.)

protestors due to its deliberate indifference to the inadequate level of training given to members of the NYPD. In deciding this issue, the Court assumes, for the purposes of this motion, that plaintiffs were falsely arrested in violation of the Fourth Amendment, and proceeds to consider whether a reasonable trier of fact could conclude that the unlawful arrests were a result of the City's deliberate indifference to insufficient training, amounting to an official policy, practice or custom to violate the Fourth Amendment.

For the reasons that will be explained, plaintiffs have not pointed to evidence that would permit a reasonable trier of fact to conclude that, as of September 2012, the City had actual or constructive notice that NYPD members were arresting protestors on disorderly conduct charges without probable cause, such that the need for more or better training should have been obvious. Connick, 563 U.S. at 61-63. Further, plaintiffs have not pointed to a specific deficiency in training that was closely related to their injuries. Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007).

B.  Legal Standard.

A municipality can be liable for a constitutional violation where the plaintiff demonstrates that a deprivation of rights occurred because of the city's official policy, custom or practice. Monell, 436 U.S. at 690. In appropriate circumstances, a municipality may be liable for a constitutional violation if "'the failure to train amounts to deliberate indifference to the rights' of those with whom the state officials will come into contact." Young v. Cnty. of Fulton, 160 F.3d 899, 903 (2d Cir. 1998) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

"'[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" Connick, 563 U.S. at 61 (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 410 (1997)).

Indeed, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a

claim turns on a failure to train."  Connick, 563 U.S. at 61.  This is because identifying a "policy

of inadequate training is far more nebulous, and a good deal further removed from the

constitutional violation," than the type of official policy at issue in Monell.  Id. (quotation marks

omitted); see also Greene v. City of New York, 742 Fed. App'x 532, 536 (2d Cir. 2018) ("a §

1983 claim against a municipality is at its weakest" when the plaintiff asserts a failure to train

claim) (summary order).

        In the context of a claim asserting inadequacies in the training of police officers,

"it may happen that in light of the duties assigned to specific officers or employees the need for

more or different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the city can reasonably be said to have been

deliberately indifferent to the need."  City of Canton, 489 U.S. at 390.  In other words, "the

inadequacy of police training may serve as the basis for § 1983 liability only where the failure to

train amounts to deliberate indifference to the rights of persons with whom the police come into

contact."  Id. at 388; see also Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008) ("a

plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving

force' behind the alleged injury.").  "A plaintiff cannot point to 'contemporaneous or

subsequent' violations to 'establish a pattern of violations that . . . provide[d] notice to the cit[y]

[that it needed] . . . to conform [its training or supervising program] to constitutional dictates.'"

Greene, 742 Fed. App'x at 536-37 (alterations in original; quoting Connick, 563 U.S. at 63 n.7).

        In Connick, the Supreme Court explained that to prove municipal liability, a

plaintiff must adduce evidence of the municipality's knowledge of training deficiencies, to a

degree that the municipality's inaction amounts to deliberate indifference to a constitutional

violation: "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." 563 U.S. at 61.  This is because once a city is on notice that its program will cause constitutional violations, its "policy of inaction" is equivalent to a decision by the city to violate the Constitution.  Id. at 61-62.  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. . . .  Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  Id. at 62.

The constitutional violation claimed by the plaintiff must closely resemble the past violations known to the city.  See id. at 62-63.  The plaintiff in Connick asserted that prosecutors had a pattern of violating the discovery obligations required by Brady v. Maryland, 373 U.S. 83 (1963), pointing to four overturned convictions in the preceding ten years due to Brady violations.  Connick, 563 U.S. at 62.  The Supreme Court concluded that those reversals were not sufficient to demonstrate notice of the claimed inadequacies in Brady training because they did not involve the disclosure of blood evidence, a crime lab report, or the physical or scientific evidence raised by the Connick plaintiff.  Id. at 62-63.

In addition to Connick's requirement for a municipality's knowledge of its training deficiencies, the Second Circuit has set forth certain factors that a plaintiff must prove to show liability on a failure-to-train claim:

> To prove deliberate indifference, we have required the plaintiff to show: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that

> training or supervision will make less difficult or that there is a
> history of employees mishandling the situation"; and (3) "that the
> wrong choice by the . . . employee will frequently cause the
> deprivation of a citizen's constitutional rights."

Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 440 (2d Cir. 2009) (quoting

Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992)).  "In addition, at the

summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training

program and establish that that deficiency is closely related to the ultimate injury, such that it

actually caused the constitutional deprivation.'"  Jenkins, 478 F.3d at 94 (quoting Green v. City

of New York, 465 F.3d 65, 81 (2d Cir. 2006)).  That deficiency must be fundamental to the

training program, and not limited to a particular undertrained officer, or even the negligent

administration of a training program:

> A pattern of misconduct, while perhaps suggestive of inadequate
> training, is not enough to create a triable issue of fact on a failure-
> to-train theory.  The plaintiff must offer evidence to support the
> conclusion that the training program was inadequate, not "[t]hat a
> particular officer may be unsatisfactorily trained" or that "an
> otherwise sound program has occasionally been negligently
> administered," and that a "hypothetically well-trained officer"
> would have avoided the constitutional violation.

Okin, 577 F.3d at 440-41 (quoting City of Canton, 489 U.S. at 390-91).  Okin concluded that a

plaintiff's deliberate indifference claim would survive summary judgment because the same

officers responsible for administering a training program on domestic violence failed to properly

respond to domestic-violence incidents, and subordinate officers showed a "sketchy"

understanding of protocols for handling domestic-violence calls.  Id. at 441.

   In deciding the City's motion, the Court need not address the three-factor Walker

test.  See Hernandez v. United States, 939 F.3d 191, 206-10 (2d Cir. 2019) (affirming dismissal

of failure-to-train claim based on the requirements of Connick and City of Canton without

- 29 -

addressing <u>Walker</u>).  As will be explained, the Court concludes that plaintiffs have not pointed to

evidence that satisfies <u>Connick</u>'s threshold requirement that the City had actual or constructive

notice of training deficiencies.  The Court separately concludes that plaintiffs have not identified

a specific deficiency in training that is closely related to their claimed injuries.

>    C.  Plaintiffs Do Not Point to Evidence that Would Permit a Reasonable Trier of
>        Fact to Conclude that the City Was on Notice of Training Deficiencies
>        <u>Relating to Probable Cause Determinations for Disorderly Conduct Charges.</u>

The City urges that it is entitled to summary judgment in its favor because no

reasonable trier of fact could conclude that it was on notice of deficiencies in the training given

to NYPD members for identifying probable cause when arresting individuals on disorderly

conduct charges, such that the City was deliberately indifferent to underlying constitutional

violations.  <u>Connick</u>, 563 U.S. at 61-63; <u>see also</u> <u>Hernandez</u>, 939 F.3d at 207 ("A municipality is

deliberately indifferent where it fails to act when it has 'actual or constructive notice,' generally

from '[a] pattern of similar constitutional violations by untrained employees,' that its training

program is 'deficient.'") (quoting <u>Connick</u>).

In opposition, plaintiffs have pointed to a battery of evidence that, they urge,

would permit a reasonable trier of fact to conclude that the City had notice of Constitutional

defects in the NYPD's administration of disorderly conduct arrests, such that the City was on

notice of a failure to train and responded with deliberate indifference.  (Pl. Opp. Mem. at 17.)

This includes civil claims brought under section 1983, letters from elected officials and

community groups, decisions of the Manhattan District Attorney not to prosecute certain

individuals charged with disorderly conduct, and even an "after-action report" written in 2002

that described crowd-intimidation tactics used to police protests at the World Economic Forum.

Drawing every reasonable inference in favor of plaintiffs as non-movants, the evidence they cite would not permit a reasonable trier of fact to conclude that the City was on notice of training deficiencies in how officers understood and applied the probable cause standard when making disorderly conduct arrests. Much of the evidence reflects longstanding public controversy over a variety of issues relating to the policing of sidewalk protests. Little of it relates to the heart of plaintiffs' municipal liability claim: whether the City was on notice that deficient training on disorderly conduct offenses was causing the NYPD to arrest protestors without probable cause. Based on the evidence offered by plaintiffs, no reasonable jury could conclude that the City had such notice. The City's summary judgment motion will therefore be granted.

### 1.   Letters from Elected Officials.

Plaintiffs observe that City Councilmember Jessica Lappin and State Senator Liz Kreuger wrote letters to then-NYPD Commissioner Ray Kelly, which expressed concerns about the policing of an Occupy Wall Street protest that took place in the Bronx sometime in 2011. (Stecklow Dec. Exs. 10, 12; Pl. 56.1 ¶¶ 8, 16.) Lappin's letter stated that a constituent contacted her with "serious concerns" about the policing of a demonstration in the Bronx, and described a YouTube video in which protestors were arrested for blocking a sidewalk, even though there was room for pedestrian foot traffic. (Stecklow Dec. Ex. 12.) Kreuger's letter makes similar observations and cites concerns about the "basic rights of speech and public assembly" and urges Kelly "to ensure police procedures are in place" that do not interfere with the right to peaceful protest. (Stecklow Dec. Ex. 10.) The City notes that the Bronx arrests arose after a small group set up tables and chairs on a sidewalk, and that after receiving the letters from Lappin and Kreuger, the NYPD referred the matter to the Internal Affairs Bureau, Special Investigations

Unit ("IAB") for investigation.  (Def. 56.1 Resp. ¶ 35 & Brocker Dec. Ex. P.)  After formal

interviews, a review of arrest paperwork and officer disciplinary histories, the IAB deemed any

misconduct claims "unsubstantiated."  (Id.)  Among other things, the IAB observed that the

protestors refused "numerous" orders to disperse and that the protestors filed no complaints

about the summons subsequently issued to them.  (Brocker Dec. Ex. P.)

A reasonable trier of fact could not conclude that the letters of these elected

officials placed the City on notice of training deficiencies that resulted in a violation of a

constitutional right.  The letters, though critical of the arrests, do not even expressly assert that

NYPD members engaged in unlawful conduct.  In response to the letters, the IAB conducted an

investigation of the arrests and deemed any claim of misconduct to be unsubstantiated.  Drawing

every reasonable inference in favor of plaintiffs as non-movants, the letters communicated

lawmakers' concern and disapproval about the arrests at the Bronx protest, but a reasonable trier

of fact could not conclude that the letters identified a training deficiency in the administration of

disorderly conduct arrests.

      2.  <u>Viewpoints of Community Groups and Members of the Public.</u>

Plaintiffs point to a letter of the New York Civil Liberties Union to Kelly dated

October 20, 2011, which raised several concerns about the policing of the Occupy Wall Street

protests, and urged, among other things, that the NYPD should permit protestors to use tents in

cold weather, allow for portable toilets and refrain from using video to surveil protest sites.

(Stecklow Dec. Ex. 9.)  The letter also suggested that officers improve efforts "to provide clear

and audible warnings" to protestors and "be more careful" about dispersing protestors.  (Id.)  The

letter's policy requests and prescriptions, while critical of the NYPD, did not place the City on

notice of claimed deficiencies in officer training.  It made no express assertion of unconstitutional conduct by officers, nor did it expressly mention disorderly conduct arrests.

Similarly, a petition with 165,766 signatures stating in part that "I stand with the protestors of Occupy Wall Street, and I demand that the NYPD respect their constitutional right to peaceful assembly" did not provide notice to the City of the claimed training deficiencies, nor did the concerned letters from the Flushing Monthly Meeting of the Religious Society of Friends, the Unison Pentecostal Church, the Partisan Defense Committee, or a member of the public who decried "brutality" against protestors.  (Stecklow Dec. Exs. 16-20.)  Those letters reflect an engaged citizenry petitioning the government about issues of public significance, but they did not give the City notice of deficiencies in the training of NYPD members.

### 3.  Earlier Civil Proceedings Directed to the Policing of Protests.

Plaintiffs point to civil lawsuits filed in 2003 and 2004 that were directed to NYPD practices during the policing of protests related to the Iraq War and the Republican National Convention.  (Pl. 56.1 ¶¶ 19-31.)  Plaintiffs in Kunstler v. City of New York, 04 Civ. 1145 (RWS), alleged that they were arrested on disorderly conduct charges without probable cause and brought claims asserting false arrest.  (Stecklow Dec. Ex. 21 at p. 73.)  The City settled those claims for more than $2 million.  (Pl. 56.1 ¶ 25.)  Similarly, plaintiffs in Allen v. City of New York, 03 Civ. 2829 (KMW) (Docket # 163), settled claims arising from their arrests at a protest for $15,000 each.

The fact that a civil action was filed and settled voluntarily is not evidence of liability on the part of the City, let alone evidence that the City was on notice of a claimed deficiency in the training it gave to NYPD members.  Absent a finding of liability by a judge or jury, the existence of historical civil actions raising similar claims "establishes . . . that other

individuals have plausibly alleged that they experienced similar violations of their constitutional rights as [plaintiff] alleges here, not that those violations actually occurred." Simms v. City of New York, 480 Fed. App'x 627, 630 (2d Cir. 2012) (summary order); see also Jean-Laurent v. Wilkerson, 461 Fed. App'x 18, 23 (2d Cir. 2012) (inmate's citation to past lawsuits claiming excessive force was "not probative of the existence of an underlying policy that could be relevant here."); Marom v. City of New York, 2016 WL 916424, at *22 (S.D.N.Y. Mar. 7, 2016) (noting at motion to dismiss stage that "allegations concerning previous section 1983 lawsuits fail to explain which – if any – lawsuits led to findings of liability against the NYPD for constitutional violations . . .").

Plaintiffs also point to a 2014 decision in which Judge Sullivan granted plaintiffs' summary judgment motion for claims directed toward a mass arrest that occurred on Fulton Street in Manhattan. Dinler v. City of New York, 2012 WL 4513352, at *1 (S.D.N.Y. Sept. 30, 2012). Dinler considered the issue of "how probable cause determinations must be made when the police suspect large groups of people of unlawful activity" and concluded that the proposed concept of "group probable cause" advanced by defendants did not defeat the requirement that officers have probable to arrest each individual. Id. at *3-6. Here, there is no contention that the plaintiffs were arrested under a theory of "group probable cause." Plaintiffs do not explain how the finding of liability in Dinler gave notice to the City that inadequacies in its training were giving rise to a violation of constitutional rights. See Connick, 563 U.S. at 61.

4. Prosecutorial Decisions Declining to Prosecute or Consenting to an Adjournment in Contemplation of Dismissal.

Plaintiffs point to the arrests of 61 marchers in the early-morning hours of January 1, 2012, which they state took place near East 13th Street and Second Avenue. (Pl. 56.1 ¶¶ 9-14.) Evidence cited by plaintiffs indicates that 61 arrests were made on charges that included

criminal mischief, resisting arrest, inciting to riot, unlawful possession of marijuana and reckless endangerment, in addition to disorderly conduct.  (Stecklow Dec. Ex. 29 at 382.)  Among the 61 arrested, 22 are denoted as "Disposed" and 36 are denoted as "DP", which presumable abbreviates "declined prosecution."  (Id.)  A notation states: "Dispositions Include: PTC: 1/Offers: 5/ACDs: 8/ Dismissal: 7/ Acquittal: I."  (Id.)  Fourteen of the arrested individuals later brought civil claims against the City, including for false arrest under 42 U.S.C. § 1983, in Peat, et al. v. City of New York, 12 Civ. 8230 (SAS).  The City settled all claims for $598,000.  (Pl. 56.1 ¶ 14.)

Plaintiffs point to similar statistics from other incidents in which large numbers of protestors were arrested.  (Pl. 56.1 ¶¶ 128-32; Stecklow Dec. Ex. 29.)  Again, the records do not distinguish disorderly conduct arrests from a variety of other charges, and suggest that the Manhattan District Attorney declined prosecution or dismissed charges against a significant majority of those arrested, including many adjournments in contemplation of dismissal. (Stecklow Dec. Ex. 29.)

A reasonable trier of fact could not conclude that evidence involving these arrests placed the City on notice of deficiencies in training NYPD members, sufficient to demonstrate deliberate indifference.  The evidence submitted by plaintiffs reflects that those arrested were charged with a variety of offenses, not just disorderly conduct.  Given the lack of clarity in the underlying statistics about these arrests, a reasonable trier of fact could not draw a meaningful inference about the probable cause for any of the disorderly conduct arrests.  Moreover, as previously discussed, the fact that the City settled the resulting section 1983 action does not demonstrate liability on the part of the City, let alone awareness of a deficiency in training.

Plaintiffs often make broad reference to the "dismissal" of charges without specifying any basis for dismissal.  (See, e.g., Pl. 56.1 ¶ 261; Pl. Mem. 19, 27; Pl. Opp. Mem. at 19-20, 23.)  A review of Exhibit 29 reflects that many charges were adjourned in contemplation of dismissal.  To the extent that district attorney's office adjourned charges in contemplation of dismissal, such an outcome "is a bargained-for dismissal of the criminal case."  Rothstein v. Carriere, 373 F.3d 275, 287 (2d Cir. 2004).  "In this type of compromise, the criminal case is adjourned before the entry of a plea, based on the prosecutor's belief that there will ultimately be a dismissal of the accusatory instrument in the interest of justice."  Id. (citing N.Y. Crim. Proc. Law § 170.55[1]-[2]); see also Martinez v. City of Schenectady, 97 N.Y.2d 78, 84 (2001) ("A termination is not favorable . . . where a prosecution ends because of a compromise with the accused.").[7]  That certain charges were adjourned in contemplation of dismissal does not reflect that an arrest occurred without probable cause or that the prosecutors considered a charge meritless.

Lastly, the decisions of the Manhattan District Attorney to dismiss charges or decline to prosecute does not, without more, shed meaningful light on the arresting officer's probable cause.  See, e.g., Starker v. Adamovych, 2020 WL 5849219, at *3 (S.D.N.Y. Oct. 1, 2020) (a prosecutor's "pre-arrest determination not to press charges does not eliminate probable cause to arrest; it merely indicates that the prosecutor did not believe there was proof of guilt beyond a reasonable doubt.") (Nathan, J.); Lumpkin v. Brehm, 2018 WL 2768641, at *7 (S.D.N.Y. June 8, 2018) ("That a prosecutor ultimately declines to prosecute does not suggest

---

[7] For this same reason, an adjournment in contemplation of dismissal is not considered a "favorable termination" and will "extinguish[ ] a malicious prosecution claim . . . ."  Rothstein, 373 F.3d at 287.  Of course, a favorable termination is not required of a plaintiff who brings a false arrest claim under section 1983.  See, e.g., Marcavage v. City of New York, 2010 WL 3910355, at *9 n.11 (S.D.N.Y. Sept. 29, 2010) (Sullivan, J.) (citing Weyant, 101 F.3d at 853).

that police officers lacked probable cause.  . . .  The existence of probable cause turns on whether there is sufficient evidence that a crime has been committed; the likelihood of proving guilt beyond a reasonable doubt is not relevant.") (Failla, J.) (quotation marks omitted); Quinn v. City of New York, 2003 WL 1090205, at *4 (E.D.N.Y. Mar. 12, 2003) ("The District Attorney's failure to prosecute furnishes no support to plaintiff.  The validity of an arrest does not depend on a finding of innocence or any other disposition.  A prosecutor's declination provides no indication that plaintiff's arrest was without probable cause.") (Weinstein, J.) (internal citation omitted).

5.   The "After-Action Report" of 2002.

Plaintiffs point to a memorandum written in 2002 by the commanding officer of the NYPD's Disorder Control Unit that was addressed to the "chief ofDepartnient" [sic] following World Economic Forum protests in the City.  (Stecklow Dec. Ex. 21 at 194-99; Pl. 56.1 ¶¶ 71-75; Def. 56.1 Resp. ¶¶ 71-75.)  The heavily-redacted document recounts certain practices that include the staging of large amounts of personnel and equipment, wearing "disorder helmets" to deter confrontation, using undercover officers to distribute misinformation to protestors, and using arrests to set a "tone."  (Stecklow Dec. Ex. 21 at 194-99.)

The document reflects a hostility toward protestors and an adversarial approach toward the policing of protests, but it does not appear to go beyond the author's subjective observations, and certainly set no policy guidance.[8]  It included no observations about disorderly conduct arrests or ascertaining probable cause.

---

[8] The memorandum's informal character and lack of official import is underscored by its extreme typographical and formatting errors, such as the concluding line, "For your infoilD8tion."  Id. at 199.

6.   Evidence of Events in 2020.

In a supplement to their Local Rule 56.1 Statement, plaintiffs point to several observations contained in a report issued by the Corporation Counsel for the City of New York in December 2020, more than eight years after the arrests of plaintiffs, which addressed various matters arising out of the 2020 protests following the death of George Floyd.  (Docket # 86; Pl. 56.1 ¶¶ 264-86.)  Among other things, the report noted that the need for more training in how to police protests.  (Id.)  Plaintiffs also point to a Civilian Complaint Review Board report summarizing complaints related to the 2020 protests (Docket # 89) and a July 2021 decision from Judge McMahon that denied a motion to dismiss a deliberate indifference claim related to alleged training deficiencies on officers' use of excessive force, as reflected in the policing of the 2020 protests.  See In re New York City Policing During Summer 2020 Demonstrations, 548 F. Supp. 3d 383 (S.D.N.Y. 2021).  However, a plaintiff "cannot point to contemporaneous or subsequent violations" in order to establish notice of a municipality's training deficiencies. Greene v. City of New York, 742 Fed. App'x at 536-37 (quotation marks omitted).  In any event, plaintiffs do not urge that any of these recent developments speak to the central issue in this case: the Constitutional adequacy of training specific to disorderly conduct arrests.

7.   Conclusion.

Viewed individually or combination, the evidence cited by plaintiffs in opposition to the City's motion would not permit a reasonable trier of fact to conclude that the City was on notice of deficiencies in the training provided to NYPD members about the probable cause determinations for disorderly conduct arrests.  The evidence largely consists of documents that are broadly critical of the NYPD's policing practices and unproven claims that asserted false arrests.  Even when evidence touches on disorderly conduct arrests, plaintiffs have not identified

why any officer's misapplication of the probable cause standard was a product of the City's deliberate indifference to Constitutional protections, as opposed to the conduct of errant officers or supervisory negligence.

Because no reasonable trier of fact could conclude that the City was deliberately indifferent to or otherwise had notice of a pattern of unconstitutional arrests caused by inadequate training, its motion for summary judgment on plaintiffs' municipal liability claim will be granted.

### D. Plaintiffs Have Not Identified a Specific Training Deficiency that Is Closely Related to Their Injuries.

The City's motion for summary judgment will separately be granted because plaintiffs have not pointed to evidence that would permit a reasonable trier of fact to conclude that a specific deficiency in the City's training program led to the injury of any plaintiff.

At the summary judgment stage, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Jenkins, 478 F.3d at 94 (quotation marks omitted); accord Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004); City of Canton, 489 U.S. at 391. Evidence of a pattern of misconduct is insufficient to defeat a municipality's summary judgment motion, as is evidence of the negligent administration of an otherwise-sound program. Okin, 577 F.3d at 440-41. "[T]he factfinder's inferences of inadequate training and causation [must] be based on more than the mere fact that the misconduct occurred in the first place." Amnesty Am., 361 F.3d at 130. A plaintiff must provide "evidence tending to rule out those causes of the [unconstitutional conduct] that would not support municipal liability, such as the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training . . . ." Id.

Plaintiffs strain to identify any specific training deficiency that is closely related to their claimed injuries.  Some of the evidence that they cite actually suggests that senior NYPD officials were closely attentive to the importance of training officers, including the use of training materials drafted in anticipation of protests at the 2004 Republican National Convention and an unadopted 2009 proposal to revamp protest trainings in light of recent information shared by the Department of Homeland Security.  Far from identifying a specific deficiency in training, this evidence suggests that leadership was attentive to the NYPD's training needs, and the fact that these materials did not become a part of an ongoing training program does not amount to a deficiency.  Other evidence cited by plaintiffs points to areas where they think that training might be improved, but it does not identify a deficiency.

1.  The 2009 Memorandum of Lieutenant Robert Schwach.

Plaintiffs point to a memorandum dated September 30, 2009, which NYPD Lieutenant Robert Schwach addressed to "Chief of Special Operations" with the subject line "Proposal for Patrol Borough Task Force Training."  (Stecklow Dec. Ex. 39.)  The memo noted that the NYPD's Disorder Control Unit ("DCU") was responsible for training NYPD members on disorder control tactics, and that it was formed in part "to create a training program for the entire department and to implement that plan."  (Id.)  It noted that some members of the DCU had recently attended a course offered by the Department of Homeland Security ("DHS"), which included updated information on tactics for policing riots and demonstrations.  (Id.)  It stated:

> A recent meeting of Task Force Training personnel revealed that few task forces are conducting regular disorder control training sessions for their members, and those that are doing so are only reviewing 1-2 different tactics at brief sessions.  Additionally, many members of the Borough Task Forces are newly assigned, and have never received appropriate disorder control training since their time in the Police Academy.

(Id.)  The memo proposed "the creation of a two-day disorder control training course," and set forth a number of topics to be addressed.  (Id.)  Many of those topics are more tactical in nature, including the use of barriers, "less-lethal munitions" and tactics for clearing looters.  (Id.)  However, a 45-minute session called "Legalities of Civil Disorder" was to consist of "[a] review of the first amendment disorderly conduct, riot, etc., and review of arrest warnings and proper legal procedures at arrests."  (Id.)  The memo's proposed training program was not approved or implemented.  (Pl. 56.1 ¶ 80; Def. 56.1 Resp. ¶ 80.)

Viewed in the light most favorable to plaintiffs, the memo does not describe a specific deficiency in the training given about applying probable cause to disorderly conduct arrests.  The two-day training course would have involved an array of issues, mostly related to tactics and technology, in an attempt to share recent DHS teachings.  As proposed by the memo, disorderly conduct would be one of a handful of issues raised in a single 45-minute training session.  The memo reflects a view that NYPD members should receive additional training on the policing of demonstrations, but it does not point out a specific training flaw that led to any plaintiff's claimed injuries.

"[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability."  Connick, 563 U.S. at 68; see also City of Canton, 489 U.S. at 392 (speculating on "something the city 'could have done'" invites "an endless exercise of second-guessing municipal employee-training programs.").  Schwach's memo reflects the goal to provide up-to-date training on the latest policing methods in light of recent DHS teachings.  It did not identify a specific deficiency in existing training programs, nor does the NYPD's decision not to adopt the proposed curriculum.

2.  Training Materials Used in Advance of the 2004 Republican National
    Convention.

Plaintiffs point out that in advance of the Republican National Convention in 2004, the NYPD's Legal Bureau provided well-received training materials that included training on making disorderly conduct arrests, including as to the announcement of warnings and permitting protestor dispersal.  (Pl. 56.1 ¶¶ 56-68; Def. 56.1 Resp. ¶¶ 56-68; Stecklow Dec. Ex. 42.)  The training materials included role-play exercises, as well as clear written guidelines on issues that officers might encounter at a protest.  (Stecklow Dec. Ex. 42.)  The United States Department of Justice later asked for permission to use the materials in its own curriculum.  (Pl. 56.1 ¶ 57; Def. 56.1 Resp. ¶ 57.)  Plaintiffs note, however, that the NYPD did not use the materials to provide supplemental training to NYPD members about how police sidewalk protests.  (Pl. 56.1 Resp. ¶ 65; Def. 56.1 Resp. ¶ 65.)  The City observes that the materials were instead incorporated into the training given to new recruits.  (Def. 56.1 Resp. ¶ 61.)

No reasonable trier of fact could identify a specific training deficiency due to the existence of the 2004 training materials and the NYPD's decision not to incorporate them into a permanent curriculum for active NYPD members.  The existence of these materials and the fact that they appear to have been well-received does not suggest a flaw in an existing training program.  If anything, the use of detailed and event-specific training materials in connection with the 2004 protests would tend to reflect that the NYPD was attentive to its members' training, including on disorderly conduct charges at mass protests.

3.  The Testimony of the City's Rule 30(b)(6) Witnesses.

Plaintiffs point to deposition testimony from Anthony J. Raganella, who the City designated as a Rule 30(b)(6) witness for the NYPD's Disorder Control Unit ("DCU") for the period of August 2010 to December 2012.  (Stecklow Dec. Ex. 1; Pl. 56.1 ¶¶ 112-13.)  Raganella

stated that the DCU provides training to both rank-and-file NYPD officers and those with a higher rank.  (Raganella Dep. at 38.)

Plaintiffs first point to testimony from Raganella about the relationship between training practices and a  district attorney's decision to decline prosecution for a large number of arrests.  Raganella testified that if he observed a large number of declined prosecutions, "that would make me curious as to whether the District Attorney's office just didn't like us, or if there was some deficiency in the way that we were conducting the arrests.  That we had an issue that needed to be addressed.  . . .  I probably would have investigated further with Captain Hailey and may have even consulted with our legal bureau to find out what the issue was, and if it was in fact something that needed to be addressed in training or not."  (Id. a 318-19.)   This testimony does not identify a specific training deficiency.  Raganella merely stated that a large number of decline-to-prosecute decisions could identify a possible training issue, or it might reflect a viewpoint of the district attorney that was different than the arresting officers'.

Plaintiff point to separate testimony from Raganella in which he indicated that supervisors at demonstrations are not trained on identifying probable cause for disorderly conduct based on obstruction to pedestrian traffic, other than what they are taught during recruit training.  (Raganella Dep. 39-40.)  However, Raganella later described training sessions where the DCU "can give examples of how it happens and how it occurs, and we do, but I can't stand in front of a classroom and tell officers, 'This is in fact when you have probable cause for disorderly conduct,' unless I'm giving them an example of what it looks like and how it takes place."  (Id. at 41.)  He also stated that disorderly conduct training takes place when instructing on mass-arrest techniques, and that the training is given in both classroom settings and as part of a mobile exercise.  (Id. at 41-42.)  It is not entirely clear whether Raganella was describing the

teaching methods used for training sessions given to recruits or sessions given mid-career, but in either event, his testimony does not identify a deficiency in training that led to plaintiffs' injuries.

Similarly, Raganella's testimony that "you can never train enough" and that training is an opportunity "to continually make ourselves more effective and efficient at what we're doing" is not evidence of a training deficiency.  (Pl. 56.1 ¶ 88; Raganella Dep. 112.)  Raganella was testifying about the benefits of training as a general matter, not indicating a deficiency in training that led to plaintiffs' injuries.

Jose Vega, another Rule 30(b)(6) witness who was designated to testify on behalf of the DCU, testified that recruits were trained on disorderly conduct charges as part of their training on conducting mass arrests.  (Pl. 56.1 ¶ 138; Vega Dep. at 70-71, attached at Stecklow Dec. Ex. 32.)  Plaintiffs also point to statements from Vega stating that "[c]rowd control training is a perishable skill" and that "[i]f you don't practice it . . . you forget what you learned when it comes to that."  (Id. at 62-63.)  These statements were in the context of discussing topics that were not taught in "initial training," like training in hazardous materials and the use of a weapon called the "M4."  (Id. at 58-62.)  His testimony did not identify deficiencies in trainings on arrest procedures or identifying probable cause on a disorderly conduct charge.

### 4. Training Specific to the Occupy Wall Street Movement.

Plaintiffs point to a December 20, 2011 memo from Raganella concerning "Training Conducted for Occupy Wall Street Movement" that reviewed mobile exercises intended "to train and test the NYPD's ability to rapidly respond to and quell any civil disorder incidents" and concluded that the exercise were "extremely purposeful, successful, and well-received."  (Pl. 56.1 ¶¶ 54-55; Stecklow Dec. Ex. 61.)  Subjects included crowd dispersal, how to safely take individuals into custody during a mass arrest and equipment use.  (Stecklow Dec. Ex.

61.)  The training was given to 1,412 NYPD members, including 12 ranked captain or above.

(Id.; Pl. 56.1 ¶ 54.)  Its recommendations noted minor deficiencies in helmets and batons.

(Stecklow Dec. Ex. 61.)  That the NYPD trained its members on tactical aspects of how to police

a large protest, including potential incidents of civil disorder, does not identify deficiencies in

trainings on arrest procedures or determining probable cause.  See Connick, 563 U.S. at 68

("[F]ailure-to-train liability is concerned with the substance of the training, not the particular

instructional format.  The [section 1983] statute does not provide plaintiffs or courts carte

blanche to micromanage local governments throughout the United States.").

Plaintiffs also point to deposition testimony given NYPD Inspector Edward

Winski in connection with a different proceeding.  (Pl. 56.1 ¶¶ 121-23.)  Winski struggled to

remember all of the elements required to arrest a person on disorderly conduct grounds for

obstructing pedestrian or vehicular traffic under section 240.20(5), testifying that the offense

occurs when "the person obstructs pedestrian or vehicular traffic" and that "[t]here probably are

some other words in there that I'm forgetting, but I'm not sure what they are right now."

(Stecklow Dec. Ex. 88 at 166.)  Winski did not recall the individual's intent to cause or risk

serious public inconvenience, annoyance or alarm.  See, e.g., Jones, 9 N.Y.3d at 262.  Winski

testified that he has trained "hundreds" of subordinates on conducting disorderly conduct arrests,

including the majority of First Precinct officers present during the Occupy Wall Street protests.

(Id. at 168.)  Winski's inability to recall each element of a section 240.20(5) offense during his

deposition does not suggest a deficiency in training and there is no indication that his

instructional sessions omitted any elements.  Even if they did, drawing every reasonable

inference in favor of plaintiffs as non-movants, occasional incidents of negligent training are not

sufficient to demonstrate a municipality's deliberate indifference to a failure to train.  See Okin, 577 F.3d at 440-41.

>    5.    Official Reports on the Policing of Protests in Summer 2020.

Plaintiffs point to the December 2020 report of the New York City Corporation Counsel and a separate December 2020 report issued by the New York City Department of Investigation, both of which discussed the policing of protests in the summer of 2020.  (Stecklow Dec. Exs. 179, 180.)  These reports were issued more than eight years after plaintiffs' arrests and therefore are not evidence of a specific deficiency in training in 2012.  Greene, 742 Fed. App'x at 536-37.

>    6.    The Supplemental Legal Bulletin Describing *People v. Jones*.

Although not specifically cited in opposition to this aspect of the City's motion, plaintiffs have elsewhere suggested that the NYPD's training was deficient because it did not provide additional training after the New York Court of Appeals issued its above-discussed decision in People v. Jones, 9 N.Y.3d 259 (2007).  As previously discussed, Jones concluded that a person standing in the middle of a sidewalk at 2:01 a.m. did not show an intent to cause public inconvenience, annoyance or harm.  Id. at 262.  Plaintiffs seem to suggest that the training given to NYPD members was outdated because the Legal Bureau did not incorporate Jones into a bulletin on disorderly conduct until February 2017.  (Pl. 56.1 ¶¶ 82-86.)

Jones certainly contains valuable guidance on the elements of a disorderly conduct offense.  However, it did not significantly alter the law governing disorderly conduct arrests.  Plaintiffs seem to suggest that a municipality has displayed deliberate indifference to training when it fails to provide guidance on the latest caselaw.  While there may be instances where a judicial decision requires immediate changes to policing practices, plaintiffs have not

explained how the lack of guidance on the holding of <u>Jones</u> amounts to a serious deficiency in training.

Approximately 18 months prior to the arrests of plaintiffs, this Court issued a decision citing <u>Jones</u> and finding that a NYPD officer had probable cause to arrest an individual for disorderly conduct under section 240.20(6) in a non-protest, sidewalk-blocking context. <u>United States v. Nelson</u>, 10-cr-414 (PKC), 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011). The decision was affirmed by the Circuit about a month after the plaintiffs' arrests.  500 Fed. App'x 90 (2d Cir. 2012).  This Court makes mention of the case only because it illustrates the highly fact-specific nature of probable cause determinations and the inability of a reader of a judicial opinion, even a City official, to draw sweeping conclusions about the adequacy of training from that single opinion.

       7.   The Court Need Not Consider the City's Evidence about the Availability of <u>On-Site Legal Advisors.</u>

In support of its motion, the City states that the NYPD provides executive officers with real-time legal advice from attorneys in its Legal Bureau.  (Def. Mem. at 19-20.)  It urges that this attorney access "severs causation" between any training lapses and any injury plaintiffs claim to have suffered.  The use and effect of this program is unclear from this record, however. It is not apparent how frequently NYPD members rely on real-time legal advice or the effect that this advice has on the actions of NYPD members.

Because plaintiffs have not pointed to any specific training deficiencies that relate to their claimed injuries, the Court need not consider what role, if any, the availability of real-time legal advice plays in the policing of protests.

8.   Conclusion.

Whether considered individually or in combination, the evidence cited by plaintiffs does not identify a specific training deficiency that is closely related to plaintiffs' claimed false arrests.  Indeed, the 2004 training materials were apparently viewed as a national model by the DOJ, and the fact that they were not enshrined as part of a permanent training program does not suggest a deficiency in training.  Similarly, the 2009 memo proposed a training regimen that would incorporate recent learnings, but it does not identify a training deficiency that resulted in unconstitutional arrests.  Rather than identify a specific deficiency in training, all of the evidence cited by plaintiffs go toward little more than plaintiffs' critiques of how alternative training approaches might be more effective.  This falls short of what is required in opposition to the City's summary judgment motion.  Jenkins, 478 F.3d at 94; Okin, 577 F.3d at 440-41.

The Court therefore concludes that no reasonable trier of fact could conclude that the plaintiffs have identified a specific deficiency in training that is closely related to their claimed injuries.  The City's summary judgment motion on municipal liability will therefore be granted.  Because plaintiffs' failure-to-train claim against the City does not survive the City's summary judgment motion, plaintiffs' claim for money damages and any claim for equitable relief will be dismissed.[9]

III.   The City's Motion Directed toward Plaintiffs' Expert Witness Is Denied without Prejudice.

In addition to moving for summary judgment, the City moves to strike the report of the City's expert witness, Robert E. Brown, as attached at Exhibit 177 of the Stecklow Declaration, and also moves that he be excluded from testifying at any future trial.

_____

[9] The Court need not reach the City's argument that plaintiffs lack standing to seek equitable relief because they cannot demonstrate that they are at imminent risk of injury caused by the future, unconstitutional administration of a disorderly conduct arrest.

The submission of Brown consists of legal conclusions about the arrests of the individual plaintiffs, and the Court has not relied on it in deciding the parties' summary judgment motions.[10]  Should the plaintiffs propose to call Brown as a witness at trial, the Court will consider the City's arguments in an in limine motion.

CONCLUSION.

Plaintiffs' summary judgment motion is DENIED in its entirety.  Defendant's summary judgment motion is GRANTED on the issue of municipal liability but DENIED as to the false arrest claims.  The City's motion directed toward Robert E. Brown is denied without prejudice.  The Clerk is directed to terminate the motions.  (Docket # 55, 69.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 30, 2022

---

[10] The submission also includes a fifteen-page report about the arrests of plaintiffs in a parallel litigation.